118 T.C. No. 13

UNITED STATES TAX COURT

ELECTRONIC ARTS, INC. AND SUBSIDIARIES, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

ELECTRONIC ARTS PUERTO RICO, INC., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 2433-99, 2434-99.        Filed March 22, 2002.

Before the years in issue, petitioner parent (EA) had relied on unrelated video games manufacturers in Taiwan and Japan to manufacture the video games that EA sold. EA created a subsidiary (EAPR) to move the video game manufacturing operations to Puerto Rico. EAPR entered into agreements with an unrelated company (PPI), which was located in Puerto Rico. PPI manufactured ignition modules and related products for small engines. PPI did not own equipment, raw materials, or components to manufacture video games. Under the EAPR-PPI agreements, EAPR leased space in PPI's factory, leased employees from PPI, bought capital equipment which was installed in the leased space, bought components and raw materials, and provided the foregoing to PPI in order to manufacture video games. PPI was paid for its services. EAPR sold the resulting video games to EA. The video games in

dispute that EA bought from EAPR were manufactured in Puerto Rico.

Petitioners moved for partial summary judgment, contending that (1) EAPR is entitled to possessions tax credits because it met the "active conduct of a trade or business" in Puerto Rico requirement of sec. 936(a)(2)(B), I.R.C. 1986, and (2) in determining the amount of these credits, EAPR is entitled to compute its income under the profit split method (sec. 936(h)(5)(C)(ii), I.R.C. 1986) because it maintained a "significant business presence" in Puerto Rico within the meaning of sec. 936(h)(5)(B)(ii), I.R.C. 1986.

1. <u>Held</u>: Ps are entitled to partial summary judgment that EAPR met the "active conduct of a trade or business" in Puerto Rico requirement of sec. 936(a)(2)(B), I.R.C. 1986. <u>MedChem (P.R.), Inc. v. Commissioner</u>, 116 T.C. 308 (2001), on appeal (1st Cir., Aug. 24, 2001), followed as to the law and distinguished on the facts.

2. <u>Held</u>, <u>further</u>, Ps are entitled to partial summary judgment that EAPR maintained a "significant business presence" in Puerto Rico within the meaning of sec. 936(h)(5)(B)(ii), I.R.C. 1986, without regard to the requirements of the final flush language of that provision.

3. <u>Held</u>, <u>further</u>, Ps have failed to show that they are entitled to partial summary judgment that EAPR maintained a "significant business presence" in Puerto Rico within the meaning of sec. 936(h)(5)(B)(ii), I.R.C. 1986, taking into account the requirements of the final flush language of that provision. That is, Ps have failed to show that the video games were "manufactured * * *in * * * [Puerto Rico] by * * * [EAPR] within the meaning of subsection (d)(1)(A) of section 954", I.R.C. 1986.

<u>A. Duane Webber</u> and <u>Andrew P. Crousore</u>, for petitioners.

<u>Michael R. Cooper</u>, <u>William R. Davis, Jr.</u>, <u>Gregory M. Hahn</u>, and <u>Virginia L. Hamilton</u>, for respondent.

OPINION

CHABOT, <u>Judge</u>:  The instant cases are before us on petitioners' motion under Rule 121[1] for partial summary judgment that petitioner Electronic Arts Puerto Rico, Inc. (hereinafter sometimes referred to as EAPR), is entitled to possessions tax credits under section 936[2] for the years in issue computed using the "profit split method".

Respondent determined deficiencies in corporate income tax against petitioner Electronic Arts, Inc. and Subsidiaries (hereinafter sometimes referred to as EA) and against petitioner EAPR, as follows:

| Fiscal Year[1] | EA | EAPR |
|---|---|---|
| 1993 | $121,795 | $1,977,045 |
| 1994 | 1,239,846 | 2,959,550 |
| 1995 | 7,000,775 | 2,646,755 |

[1]  Taxable years ending March 31 of each of the years in issue. References in this opinion to either petitioner's fiscal years are to that petitioner's taxable year ending March 31 of the indicated years.  Fiscal 1996 is involved as to EA because of a net operating loss carryback from fiscal 1996 to fiscal 1993.

Petitioners claim overpayments as follows:

---

[1]Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Unless indicated otherwise, all section references are to sections of the Code as in effect for the years in issue, and all Code references are to the Internal Revenue Code of 1986.

| Fiscal Year | EA[1] | EAPR |
|-------------|-------|------|
| 1993 | $65,000 | $4,519 |
| 1994 | 65,000 | 7,739 |
| 1995 | 1,450,000 | -- |

[1] EA claims these amounts as minimum overpayment amounts.

The issues for decision under petitioners' motion for partial summary judgment are as follows:

(1) Whether EAPR was engaged in the active conduct of a trade or business in Puerto Rico during the years in issue and was entitled to section 936 possessions tax credits for these years. (This issue affects both dockets.)

(2) If yes, then whether EAPR had a significant business presence in Puerto Rico, with respect to the manufacture[3] of standardized video game cartridges (hereinafter sometimes referred to as video games), during the years in issue so as to entitle EAPR to elect to use the profit split method in lieu of the general rule of section 936(h)(1). Subsidiary questions are (a) whether the video games were

_____

[3]The statute uses the phrase "manufactured or produced". The parties' stipulations in 12 instances refer to the video games as having been "manufactured" and in 2 instances as having been "produced". It is not clear what is the congressionally intended difference between "manufactured" and "produced". The Court does not discern any difference that would have consequences for the instant cases, and, so far as we can tell neither do the parties.

manufactured in Puerto Rico, and (b) whether EAPR's activities constituted the manufacture of the video games in Puerto Rico by EAPR "within the meaning of subsection (d)(1)(A) of section 954", as required by section 936(h)(5)(B)(ii) (final flush).  (This issue affects only the EAPR docket, 2434-99.)

Our statements as to the facts are based entirely on the parties' stipulations of facts and exhibits, those matters that are admitted in the pleadings, those matters that are admitted in the motion papers, and those matters set forth in affidavits submitted by the parties.

## I.  Background

### A.  The Petitioners

When the respective petitions were filed in the instant cases, both EA and EAPR were Delaware corporations with their principal corporate offices in Redwood City, California.  (EA was incorporated in Delaware in September 1991; its predecessor was incorporated in California in 1982.)  For the years in issue, both EA and EAPR kept their books and filed their income tax returns on the basis of an accrual method of accounting and a fiscal year ending March 31.

During the years in issue, EA developed, manufactured (or had manufactured), marketed, and distributed interactive entertainment software for a variety of entertainment systems,

including such well-known entertainment systems as the Sega Genesis, Sony Playstations, and Nintendo Systems, as well as Apple and IBM-compatible computers.  EA derived its revenues during the years in issue predominantly from the sale to both U.S. and foreign customers of standardized video game cartridges and compact discs containing entertainment software.  Under a license agreement between EA and Sega Enterprises Ltd. (hereinafter sometimes referred to as Sega), dated July 1992, Sega granted to EA and any affiliate controlled by EA a license to use Sega intangible property to develop, manufacture, market, and sell video game cartridges compatible with the Sega Genesis systems.  EA distributed products primarily through its own sales force in the United States, which sold directly to retail chains and outlets.  Outside the United States, EA distributed its products primarily through affiliates and third-party distributors.

Before the years in issue, EA relied on unrelated video game manufacturers located in Taiwan and Japan to manufacture the video games.

Beginning in 1991 (during EA's fiscal 1992), EA became interested in, and investigated the feasibility of, establishing a video game undertaking in Puerto Rico through a wholly owned subsidiary.  In 1992, EA engaged Richard Baker as a consultant to provide advice in connection with the investigation and

establishment of such an undertaking.  EAPR was incorporated under Delaware law on May 15, 1992, as a subsidiary of EA, to manufacture video games and other software entertainment products.  EA bought video games from EAPR in each of the years in issue.

B.  Agreements; Procedures

EA issued purchase orders to EAPR for video games.  EA generated these purchase orders in San Mateo, California.  When EAPR, through its manager and employees covered by the Manufacturing Services Agreement (hereinafter sometimes referred to as the Agreement), shipped completed video games to EA, EAPR's manager or an employee covered by the Agreement (hereinafter sometimes referred to as a lease employee) input into EAPR's computerized Material Requirement Planning System (hereinafter sometimes referred to as the MRP System) shipping data relating to the shipment.  (The Agreement, including the arrangements as to lease employees, is described in greater detail infra I.E.) The MRP System was used to manage EAPR's inventories by tracing (a) raw materials and components as inputs and inventory, (b) production schedules, (c) movements of material and component inventories through stages of the manufacturing process, and (d) finished video games as outputs relating to the manufacture of video games in Puerto Rico.  An invoice from EAPR then was generated in San Mateo with respect to the completed video games.

EA, through its accounting department, paid EAPR's invoices by making wire transfers from EA's bank account to EAPR's bank account in Puerto Rico during the years in issue. After EAPR was established, substantially all the video games that EA bought for Sega Genesis systems were manufactured in Puerto Rico. By the end of 1993, EA stopped buying video games for Sega Genesis systems from unrelated parties in Asia. The video games in dispute that EA bought were manufactured in Puerto Rico.

EAPR as lessee entered into a commercial lease (hereinafter sometimes referred to as the Lease) with Power Parts, Inc. (hereinafter sometimes referred to as PPI), on June 25, 1992, relating to a portion of the facilities PPI owned in Santa Isabel, Puerto Rico. Through 1993, the Lease applied to an area of 4,500 square feet, which by oral agreement was increased to 6,000 square feet in 1994, and 8,000 square feet in 1995 and later years. The leased space was segregated from PPI's manufacturing operations. The leased space was a room in a different part of PPI's building and was protected by EAPR's security system, which included video camera surveillance and a combination lock door entrance. Access to the leased space was allowed only to EAPR's manager, EAPR's CFO, lease employees, and PPI employees who performed services covered by the Agreement. The leased space was used exclusively for the manufacture of video games and for related functions.

The Agreement required EAPR to provide, "at its own cost and expense," all the capital equipment needed to manufacture the video games, and required this equipment to be located in the leased space. Under the Agreement, PPI was responsible for routine normal maintenance and EAPR was responsible for repairs, parts, and replacement. EAPR bought, and during the years in issue owned, all of the equipment (including wave solder machines, production assembly lines, label machines, and test equipment) used in Puerto Rico to manufacture the video games. EAPR bought the equipment from unrelated sellers.

The Agreement required EAPR to provide "all materials and components for the manufacture of Products [the video games]." The Agreement provided that EAPR was responsible for ordering these items and paying for them, and "PPI shall have no authority to order or purchase or otherwise represent EAPR with respect to such materials and components." The manufacture of video games required various components and materials, including ROM and RAM chips, printed circuit boards, batteries, plastic cases, and other parts. EAPR paid for and owned all such components and materials used in Puerto Rico to manufacture the video games in issue. Raw materials and components were obtained from unrelated suppliers. EA's personnel in San Mateo issued purchase orders to vendors for raw materials and components on behalf of EAPR.

EAPR maintained its own bank account in Puerto Rico from which it paid for raw materials and components, labor (including amounts paid to PPI), and other supplies and services. EAPR's board of directors authorized officers of EAPR and two employees of EA's accounting department to execute checks on behalf of EAPR. EAPR's checks for raw materials and components, labor (including amounts paid to PPI), and other supplies and services were prepared and signed on EAPR's behalf by these authorized people in EA's offices in San Mateo.

EA employees in San Mateo entered purchase forecast and order information into the MRP System. Unrelated vendors shipped raw materials and components directly to EAPR in Puerto Rico, based on need as determined under the MRP System. Deliveries of raw materials and components were received and inspected by EAPR's manager, lease employees, or PPI employees; these services by PPI employees were covered by the Agreement. The raw materials and components were stored in separately identified warehouse space covered by the Lease.

At or near the end of each fiscal year, one or more lease employees, under the supervision of EAPR's manager and an accounting staff person from EA who visited Puerto Rico for this purpose, performed a physical inventory of EAPR's materials inventory, work in process, and finished goods.

At all times during the manufacture of the video games in Puerto Rico, EAPR owned all materials and components, work in process inventory, and finished products relating to the video games that EA bought.

EA bought from EAPR the video games in dispute in the instant cases. EAPR was not a sham corporation.

C. Manufacturing Process

Video games were manufactured in the leased space covered by the Lease, that is, the leased portion of the facilities owned by PPI in Santa Isabel. The following general steps were used in manufacturing these video games: The raw materials and components necessary for a production run were procured from the warehouse space covered by the Lease and placed in the production area as needed. The leads on various components for each video game (including capacitors, resistors, and integrated circuits) were formed (i.e., bent and cut, as required) using various types of formers. The formed components were then supplied to a "push-along" assembly line in which they were inserted, along with ROM chips and any batteries or other required components, into bare printed circuit boards.

The circuit boards with the inserted items[4] were then placed on the automatic conveyer in a wave solder machine, where flux

---

[4]We assume that that is what the parties mean by their stipulated--but undefined--term "populated boards".

was deposited on the soldering points (i.e., the contact points between the components and the printed circuit board) and the boards were conveyed through a bath of liquid solder that soldered the components to the board at these points. The soldered boards were then inspected, any defective solder joints were resoldered by hand (if possible), and any other defects were reworked or repaired.

The boards were then cleaned and repaired to remove any excess solder and debris, and were transferred to the testing area where the boards were tested for electronic functionality. The tested boards were then assembled into video game cartridge housings, together with any other necessary components and the appropriate labels. The finished video games were then fully tested again for the overall functionality of the game; the tested games were then boxed and prepared for shipping and were subject to a further quality audit before transfer from the leased production area covered by the Lease to the warehouse space covered by the Lease.

The lease employees performed the above-described manufacturing processes.

Table 1 shows the number of video game cartridges that were manufactured in Puerto Rico that EAPR sold and delivered to EA during the years in issue.[5]

Table 1

| Fiscal Year | Units |
|-------------|-----------|
| 1993 | 2,588,306 |
| 1994 | 7,378,471 |
| 1995 | 6,485,815 |
| 1996 | 4,077,218 |

D.  PPI

PPI was a Delaware corporation based in Santa Isabel; it was an affiliate of R.E. Phelon Company, Inc., a U.S. corporation. PPI was not related to EA or EAPR.  In its Santa Isabel facility, PPI manufactured proprietary ignition modules and related products for use in small engines.  PPI had about 300 employees in Santa Isabel in connection with this business.  PPI did not own the equipment, raw materials, and components necessary to manufacture video games.

E.  EAPR-PPI Agreement

On June 25, 1992, EAPR and PPI entered into the Agreement, relating to the lease employees and certain services.  Under the Agreement, EAPR was required to give to PPI (and update

_____

[5]It is not always obvious when the parties' stipulations are intended to refer to fiscal years and when to calendar years.  In this instance, we believe the parties intended their stipulation to refer to fiscal years, even though the stipulation does not say so.

quarterly) a forecast of the number of "employees expected to be required by EAPR for each production or other operation and on each shift for each calendar month".  PPI was required to "use its best efforts to dedicate and lease to EAPR the number of employees shown in each then current Manpower Forecast subject to the availability of such employees."

Under the Agreement, PPI was required to hold EAPR harmless from any liability resulting from any third-party claim against EAPR to the extent the liability "(iv) relates to PPI's employment of any employee leased to EAPR hereunder but does not relate to EAPR's supervision of such employee."  EAPR was required to hold PPI harmless from any liability resulting from any third-party claim against PPI to the extent the liability "(vii) relates to EAPR's supervision of any employee leased by it from PPI hereunder".

Under the Agreement, EAPR was required to compensate PPI for the lease employees' hourly wages burdened for overhead expenses, plus a 30-percent markup.  EAPR was required to pay an additional 10 percent of the employee lease charge for other services, including receiving goods, shipping, incoming and outgoing inspections, security, and utilities and maintenance.  In return, PPI was responsible for payroll, worker's compensation, and related taxes attributable to the wages of the lease employees. Under the Agreement, EAPR made advance payments to PPI on a per-

video game basis with respect to the fees for the lease employees and other services.

Under the Agreement, which sets forth a nonexclusive list of 10 "Services", PPI agreed to provide "Day to day management of employees leased by EAPR pursuant to Section 2 [of the Agreement]." Section 2 of the Agreement, entitled "Lease of Employees", provides in pertinent part as follows:

> All employees leased by PPI hereunder shall be located in the Premises leased by EAPR from PPI and shall be under the general supervision of EAPR. EAPR shall also supervise and control all technical and product-related training required by such employees. EAPR shall have the right to locate its own employees in the building space leased by it from PPI for the purpose of overseeing and directing the work of the employees leased to it by PPI subject to the requirements of the Lease attached hereto as Exhibit A. [The Lease is not attached to the stipulated copy of the Agreement, but the Lease is in the record in the instant cases as a separately stipulated exhibit.]

The Lease provides in pertinent part as follows:

> 3. USE: The Premises are to be used as a manufacturing facility for the manufacture of videogame cartridges and shall be used solely by those employees leased from Lessor [PPI] by Lessee [EAPR] pursuant to a manufacturing services agreement and by one additional employee of Lessee, unless Lessor consents to use by other employees, and for no other purpose, without the prior written consent of Lessor.

PPI invoiced EAPR for all labor costs as specified under the Agreement on the basis of the number of completed video games. This invoice charge included the amount of any taxes and unemployment contributions paid with respect to lease employees. The amount invoiced was determined based on labor costs, taxes,

unemployment contributions, overhead, and a profit for PPI.  EAPR paid PPI's invoices with respect to the lease employees and services covered by the Agreement.

The lease employees performed manufacturing functions relating to video games.  During 1993 through 1996 the manufacture of the video games that EAPR delivered to EA required about 35 regular full-time employees during normal production periods.  During peak production periods up to about 400 or more additional lease employees in multiple shifts were necessary to meet EAPR's production schedule.

F.  EAPR's Manager and Officers

EAPR employed a manager who at all times during the years in issue lived in Puerto Rico and worked in the leased space. During fiscal 1993 through fiscal 1996 (supra note 5) the following people held the position of manager:  Willie Zamora, Jose Cruz, and Orlando Alvarado, hereinafter sometimes referred to as Zamora, Cruz, and Alvarado, respectively.  Table 2 shows the total salaries and fringe benefits EAPR paid to its manager during these years.

Table 2

| Fiscal Year | Amount |
|-------------|--------|
| 1993 | $43,940 |
| 1994 | 61,729 |
| 1995 | 38,262 |
| 1996 | 46,035 |

Zamora died in August 1993. Cruz was hired as Zamora's assistant 2 weeks before Zamora died. Cruz's employment was terminated after 3-1/2 weeks--1-1/2 weeks after Zamora died. In December 1993, Alvarado was hired as EAPR's manager. During the 5 or so months after Zamora died and before Alvarado was hired, a number of EA's employees came to Puerto Rico on 2-week details to do the necessary work.[6] Once hired, Alvarado served as EAPR's manager until the summer of 1996.

As EAPR's manager, Alvarado supervised two or three PPI employees in charge of managing materials, from raw materials through work in process to finished goods. Alvarado supervised PPI employees who worked on inventory control and saw to it that they entered the correct data into the computer for operation of the MRP systems. In general, Alvarado did not deal directly with the assembly line operation. However, if he saw mistakes being made, then he saw to it that the mistakes were corrected. Also, PPI called him in for assistance "If things were going wrong".

---

[6]Much of the material in this item F. EAPR's Manager and Officers, is based on statements in unsigned declarations by Cruz and Alvarado, attached to an affidavit submitted by respondent. Petitioners' counsel agreed that they would not raise hearsay objections to these declarations. On brief, petitioners contend that documents from personnel files which petitioners provided to respondent would "definitely establish" that Zamora died on Oct. 16, 1993 (not in August 1993), and that Cruz was hired after Oct. 16, 1993 (not 2 weeks before Zamora died). No such personnel file documents are before us. In any event, the essential thrust of our conclusions would not be affected by the modifications that might be required by the above-described personnel file documents.

Various EA corporate officers served as directors or corporate officers of EAPR. As with various officers and directors of other EA affiliates, they were not separately compensated for serving as officers of EAPR. The compensation paid to EA's officers (including those who were officers of EAPR) was included in EA's general administrative expense. EA's general administrative expense was included in the computation of the combined profit for purposes of applying the profit split computation under section 936(h).

G.  EAPR's Finances

EAPR's cost of goods sold with respect to video games included direct costs and period costs. Direct costs included materials and labor. Labor costs included amounts paid to PPI pursuant to the Agreement. Period costs included materials and labor for "rework" (a stipulated, but undefined, term).

Table 3 shows EAPR's total cost of goods sold relating to the video games it sold to EA, and net sales of video games to EA (without regard to the profit split allocation under section 936(h)(5)).

Table 3

| Fiscal Year | Cost of Goods Sold | Net Sales |
| --- | --- | --- |
| 1993 | $21,119,356 | $22,488,000 |
| 1994 | 56,807,000 | 59,211,000 |
| 1995 | 76,429,990 | 79,559,000 |
| 1996 | 42,500,108 | 45,004,000 |

## II. Discussion

### A.  In General

Summary judgment is a device used to expedite litigation; it is intended to avoid unnecessary and expensive trials.  However, it is not a substitute for trial; it should not be used to resolve genuine disputes over material factual issues.  Cox v. American Fidelity & Casualty Co., 249 F.2d 616, 618 (9th Cir. l957); Vallone v. Commissioner, 88 T.C. 794, 801 (1987).  A decision will be rendered on a motion for partial summary judgment if the pleadings, answers to interrogatories, depositions, admissions, and other acceptable materials, together with the affidavits, if any, show that there is not any genuine issue as to any material fact and that a decision may be rendered as a matter of law.  Rule 121(b).  A partial summary adjudication may be made which does not dispose of all the issues in the case. Id.

Because the effect of granting a motion for summary judgment is to decide the case against a party without allowing that party an opportunity for a trial, the motion should be "cautiously invoked" and granted only after a careful consideration of the case.  Associated Press v. United States, 326 U.S. 1, 6 (1945); Cox v. American Fidelity & Casualty Co., 249 F.2d at 618; Kroh v. Commissioner, 98 T.C. 383, 390 (1992).

Petitioners, as the moving parties, have the burden of showing the absence of a genuine issue as to any material fact. For these purposes, the party opposing the motion is to be afforded the benefit of all reasonable doubt, and the material submitted by both sides must be viewed in the light most favorable to the opposing party; that is, all doubts as to the existence of an issue of material fact must be resolved against the movants. E.g., Adickes v. Kress & Co., 398 U.S. 144, 157 (1970); Dreher v. Sielaff, 636 F.2d 1141, 1143 n.4 (7th Cir. 1980); Kroh v. Commissioner, 98 T.C. at 390.

In the instant cases, respondent has not filed any cross-motion for partial summary judgment. Where, as in the instant cases, only one side has moved for summary judgment, there is implicit in the movants' obligations as to material facts that the movants have to persuade the Court that they have correctly identified what facts are material.

Petitioners submitted the affidavits of Richard C. Baker and J. Everett Milott. Richard C. Baker, a consultant in the early 1990s, describes his role in the establishment of EAPR, the establishment of the operations in the facility that EAPR leased from PPI, and the activities of Zamora. J. Everett Milott, PPI's executive vice present and general manager when he executed his affidavit, describes PPI's activities from 1992 through 1996 in connection with the Agreement and the Lease. Respondent

submitted the affidavits of Michael J. Cooper and Dale L. Curren, and the declaration of Patricia Zentner.  Michael J. Cooper describes the events leading to the unsigned declarations of Cruz and Alvarado (supra note 6 and accompanying text).  Dale L. Curren, a computer systems analyst with respondent's Office of Chief Counsel, describes and furnishes a PPI homepage and PPI contact page secured at some unstated date, which appears to have been no earlier than August 4, 1999.  Patricia Zentner, an international examiner for respondent, describes various documents she sent to, or received from EA (and her notes on those documents), and various documents showing that certain paperwork in connection with EAPR activities originated in EA's offices in San Mateo, California.  For purposes of the instant partial summary judgment motion, we have treated the statements as to matters of fact in the Alvarado declaration as though (1) they accurately describe the events they deal with, and (2) the events that occurred before Alvarado was hired also were consistent with these statements--except, of course, to the extent that the statements are contrary to the parties' stipulations.

One more preliminary matter:  At various points in their analyses, both sides urge us to follow the "plain meaning" of the statutes.  Of course, each side understands the plain meaning to be about 180 degrees different from the other side's view of the

plain meaning.  Our reaction is that none of the issues that the parties have asked us to rule on in the partial summary judgment motion before us can be resolved by merely looking at the plain meaning of the statutes we deal with.

We consider first (both dockets) whether petitioners are entitled to partial summary judgment that EAPR was engaged in the active conduct of a trade or business in Puerto Rico so as to entitle it to possessions tax credits for the years in issue.  We then consider (the EAPR docket) whether petitioners are entitled to partial summary judgment that EAPR had a significant business presence in Puerto Rico so as to entitle it to compute its taxable income using the "profit split" method for the years in issue.

### B.  Active Conduct of a Trade or Business

#### 1.  Parties' Contentions

Respondent contends that petitioners' partial summary judgment motion must be denied because (1) "as a matter of law * * * Petitioners cannot attribute the activities of the PPI or EA employees to EAPR" to satisfy the active-conduct-of-a-trade-or-business test under section 936(a)(2)(B); and (2) if attribution is not per se impermissible, then "there are material facts in dispute that are relevant to the statutory" test.

Petitioners contend that the tax credit under section 936, and the predecessor statutes back to 1921 (which provided an

income tax exemption instead of a credit), "were enacted to stimulate the creation of jobs and investment in U.S. possessions, and to provide a tax benefit to taxpayers that created such jobs and investment." They urge us to "construe section 936 in favor of [such] taxpayers" and to "construe narrowly any limitations on the intended benefits". Petitioners further contend that the functions performed by the lease employees "are properly considered, as a matter of law, to be functions performed by EAPR in Puerto Rico for purposes of applying the active trade or business test." Finally, petitioners contend that "There are no facts upon which Petitioners rely that are reasonably in dispute." Petitioners further maintain that, even if we were to agree with respondent's contentions that certain factual matters are in dispute, these matters "are not material to a holding by the Court on this issue [i.e., that EAPR derived income from the active conduct of a trade or business in Puerto Rico]."

2.  Summary of Conclusions

We agree with several of petitioners' contentions and with petitioners' conclusion that their motion for partial summary judgment on the active-conduct-of-a-trade-or-business issue should be granted.

The Code does not appear to include a definition of the term "active conduct of a trade or business" as that term is used in

section 936(a)(1)(A)(i).  That term is used in more than 20 other sections of the Code, and we do not find a statutory definition for that term as used in any of these other sections.  Code provisions generally are to be interpreted so congressional use of the same words indicates an intent to have the same meaning apply, and congressional use of different words indicates an intent to have a different meaning apply.  Under these circumstances, authoritative interpretations of that term as used in other provisions of the Code may be regarded as proper precedent for interpreting that term as used in section 936(a).  In particular, we focus on opinions interpreting that term in the Western Hemisphere Trading Corporations context, and on Treasury Regulations interpreting that term in the context of sections 179, 355, and 367.  Applying our analysis in MedChem (P.R.), Inc. v. Commissioner, 116 T.C. 308 (2001), on appeal (1st Cir., Aug. 24, 2001), and the interpretations in Western Hemisphere Trading Corporations cases to the factual matters established by the parties' stipulations, pleadings, affidavits, etc., we conclude that EAPR's activities amounted to the active conduct of a trade or business in Puerto Rico, within the meaning of section 936(a), during the years in issue.

We conclude that respondent's contentions as to disputes over factual matters are all (1) contradicted by the stipulations or pleadings, or (2) immaterial, or (3) both.

We hold, for petitioners, that they are entitled to the partial summary judgment they seek on this issue.

3. Analysis

Section 936(a)[7] provides that if a qualified domestic

---

[7]Sec. 936(a) provides, in pertinent part, as follows:

SEC. 936. PUERTO RICO AND POSSESSION TAX CREDIT.

(a) Allowance of Credit.--

(1) In general.--Except as otherwise provided in this section, if a domestic corporation elects the application of this section and if the conditions of both subparagraph (A) and subparagraph (B) of paragraph (2) are satisfied, there shall be allowed as a credit against the tax imposed by this chapter [chapter 1, relating to normal taxes and surtaxes] an amount equal to the portion of the tax which is attributable to the sum of--

(A) the taxable income, from sources without the United States, from--

(i) the active conduct of a trade or business within a possession of the United States, or

(ii) the sale or exchange of substantially all of the assets used by the taxpayer in the active conduct of such trade or business, and

(B) the qualified possession source investment income.

(2) Conditions which must be satisfied.--The conditions referred to in paragraph (1) are:

(A) 3-year period.--If 80 percent or more of the gross income of such domestic corporation for the 3-year period immediately preceding the close of the taxable year (or for such part of such period immediately preceding the close of such

(continued...)

corporation elects to have section 936 apply, then that corporation is entitled to a credit against its income tax.  One requirement for such treatment, as applied to the instant cases, is that EAPR have derived at least 75 percent of its gross income[8] "from the active conduct of a trade or business within * * * [Puerto Rico]".

Section 936 does not define the term "active conduct of a trade or business".  As far as we can tell, the Code does not include a definition of this term as it is used in section 936.

---

[7](...continued)
> taxable year as may be applicable) was derived from sources within a possession of the United States (determined without regard to section 904(f)); and

> (B) Trade or business.--If 75 percent or more of the gross income of such domestic corporation for such period or such part thereof was derived from the active conduct of a trade or business within a possession of the United States.

Sec. 13227(a)(1) of the Omnibus Budget Reconciliation Act of 1993 (OBRA 1993), Pub. L. 103-66, 107 Stat. 321, 489, amended sec. 936(a)(1) by striking "as provided in paragraph (3)" and inserting "as otherwise provided in this section".  Although this amendment applies to taxable years beginning after Dec. 31, 1993, the amendment does not affect the substance of the above-quoted portion of sec. 936(a).  OBRA 1993, sec. 13227(f), 107 Stat. at 494.  Thus, we have quoted sec. 936(a)(1) as amended by OBRA 1993.

[8]The dispute the parties have presented to us does not focus on the numbers.  Accordingly, our analysis deals with the quality of the activity, and not with the amount or percentage of EAPR's gross income from the activity.

The term "active conduct of a trade or business" appears in 22 sections of the current version of the Code.  MedChem (P.R.), Inc. v. Commissioner, 116 T.C. at 330.  Ordinarily, we would expect that this term would have the same meaning in all the places it appears.  United States v. Cleveland Indians Baseball Co., 532 U.S. 200, 213 (2001); Commissioner v. Keystone Consol. Industries, Inc., 508 U.S. 152, 159 (1993); United States v. Olympic Radio & Television, 349 U.S. 232, 236 (1955); Zuanich v. Commissioner, 77 T.C. 428, 442-443 (1981), and cases there cited.[9]  However, none of the other Code provisions includes a

---

[9]This is the general rule not only because of the authority of the cited opinions, but also because this is the way legislative drafters are instructed to draft statutes.  See, e.g., Office of the Legislative Counsel U.S. House of Representatives, Style Manual; Drafting Suggestions for the Trained Drafter, 3 (1989), as follows:

> (4) Use same word over and over.--If you have found the right word, don't be afraid to use it again and again.  In other words, don't show your pedantry by an ostentatious parade of synonyms.  Your English teacher may be disappointed, but the courts and others who are straining to find your meaning will bless you.

> (5) Avoid utraquistic subterfuges.--Do not use the same word in 2 different ways in the same draft (unless you give the reader clear warning).

To the same effect, see Dickerson, The Interpretation and Application of Statutes 224 (1975), quoted in Zuanich v. Commissioner, 77 T.C. 428, 443 n.26 (1981), as follows:

> [26] See R. Dickerson, The Interpretation and Application of Statutes 224 (1975), as follows:

> Because legal documents are for the most part

(continued...)

statutory definition of this term.  Also, as far as we can tell,
nowhere else in the Code is there a definition of this term as it
is used in section 936 or in any of the other Code sections in
which this term is used.

In MedChem (P.R.), Inc. v. Commissioner, 116 T.C. at 333, we
pointed out that "the roots of that section [936] are found in
section 262 of the Revenue Act of 1921", and we briefly
summarized the purpose and history of the statute in accordance
with our analyses in G.D. Searle & Co. v. Commissioner, 88 T.C.
252, 350-351 (1987), and Coca-Cola Co. & Subs. v. Commissioner,
106 T.C. 1, 21 (1996).  From section 262 of the Revenue Act of
1921 through section 931, I.R.C. 1954, a qualifying domestic
corporation was exempt from Federal income taxes on certain

---

[9](...continued)
nonemotive, it is presumed that the author's language
has been used, not for its artistic or emotional
effect, but for its ability to convey ideas.
Accordingly, it is presumed that the author has not
varied his terminology unless he has changed his
meaning, and has not changed his meaning unless he has
varied his terminology; that is, that he has committed
neither "elegant variation" nor "utraquistic
subterfuge".  This is the rebuttable presumption of
formal consistency.  [Fn. refs. omitted.]

In United States v. Cleveland Indians Baseball Co., 532 U.S.
200, 213 (2001), the Supreme Court made it clear that there are
some circumstances where "'the meaning [of the same words] well
may vary to meet the purposes of the law,'" quoting Atlantic
Cleaners & Dyers v. United States, 286 U.S. 427, 433 (1932).  It
does not appear that the circumstances dealt with in Cleveland
Indians have a persuasive parallel as to the active-conduct-of-a-
trade-or-business issue.  However, see infra II. C. for
discussion of the term "manufactured or produced".

foreign-source income.  In the Tax Reform Act of 1976, the Congress eliminated the exemption and in its place enacted the credit mechanism of section 936.  Tax Reform Act of 1976, Pub.L. 94-455, sec. 1051, 90 Stat. 1520, 1643.  Section 936 uses, and each of these predecessors used, the term "active conduct of a trade or business".  See MedChem (P.R.), Inc. v. Commissioner, 116 T.C. at 333-336.  Also in accordance with the general interpretation rule that statutory language should be given the same meaning wherever it appears, we reviewed the regulations interpreting "active conduct of a trade or business" in sections 1.179-2(c)(6), Income Tax Regs., 1.355-3(b)(2), Income Tax Regs., and 1.367(a)-2T(b), Temporary Income Tax Regs., 51 Fed. Reg. 17942 (May 15, 1986).  Id. at 330-333.  Synthesizing the foregoing, we concluded as follows, id. at 336-337:

> On the basis of our understanding of the legislative record, we believe that Congress promulgated the "active conduct of a trade or business" requirement of section 936(a) intending to prevent a domestic corporate taxpayer from availing itself of the possessions tax credit unless it established and regularly operated an employment-producing, profit-motivated business activity in a U.S. possession.  We also believe that Congress expected the taxpayer to participate meaningfully in the management and operation of that activity and to invest significantly in that activity, the expected result of which would be to strengthen the economy of the possession where the activity was located. In light of Congress' intent for section 936, the Secretary's interpretations of the subject phrase for purposes of other sections of the Code, and the Supreme Court's interpretation of the phrase "trade or business" in section 162(a), we believe that, for purposes of section 936(a), a taxpayer actively conducts a trade or business in a U.S. possession only if it participates regularly, continually, extensively, and actively in the management and operation of its profit-

motivated activity in that possession. Cf. Commissioner v. Groetzinger, 480 U.S. [23,] 26 [(1987)]; Higgins v. Commissioner, 312 U.S. [212,] 217 [(l941)]; Stanton v. Commissioner, 399 F.2d 326, 329-330 (5th Cir. 1968), affg. T.C. Memo. 1967-137. We also believe that, for the purpose of this participation requirement, the services underlying a manufacturing contract may be imputed to a taxpayer only to the extent that the performance of those services is adequately supervised by the taxpayer's own employees.

Another source of guidance may be found in the interpretation of "active conduct of a trade or business" in the provisions dealing with Western Hemisphere Trading Corporations, hereinafter sometimes referred to as WHTCs. The WHTC provisions existed in the Code for a substantial portion of the history of section 936 and its predecessors. The WHTC provisions were enacted by sections 105(b) and 141 of the Revenue Act of 1942 as sections 15(b) and 109, I.R.C. 1939. Pub. L. 77-619, 56 Stat. 798, 806, 838. Under these provisions, a domestic corporation qualified for the WHTC exemption only if (1) all of its business was conducted in the Western Hemisphere, (2) it derived at least 95 percent of its gross income from sources outside the United States, and (3) it derived at least 90 percent of its gross income "from the active conduct of a trade or business." Sec. 109(b), I.R.C. 1939.

WHTCs were exempt from the corporate surtax until the Revenue Act of 1950, Pub. L. 81-994, 64 Stat. 906, 915, 920, which replaced the exemption (sec. 121(c) of the Act) with a credit computed as a specified percentage of normal-tax net

income.  Sec. 122(c) of the Act.  The Internal Revenue Code of 1954 substituted for this a formula deduction resulting in a 14-percentage-point tax rate reduction.  See sec. 922, I.R.C. 1954.  The WHTC provisions, I.R.C. 1954 secs. 921 and 922, were repealed by sec. 1052(b) of the Tax Reform Act of 1976, Pub. L. 94-455, 90 Stat. 1520, 1648.

Several opinions of this and other courts have noted the general similarity of congressional purpose between the possessions corporations provisions and the WHTC provisions.  In view of the WHTC provisions' use of the term "active conduct of a trade or business", we believe that opinions interpreting that term as used in the WHTC provisions are helpful in interpreting the same term in section 936(a).  As we see it, the WHTC opinions are essentially consistent with the analysis in MedChem (P.R.), Inc. v. Commissioner, supra.

Section 936(a)(2)(B) requires that 75 percent of the gross income of the qualifying corporation (in the instant cases, EAPR) be "derived from the active conduct of a trade or business within a possession of the United States", in the instant cases, Puerto Rico.  In comparison, the effect of the WHTC provisions was to require that at least 90 percent of the gross income of the qualifying corporation had been derived "from the active conduct of a trade or business" in the Western Hemisphere outside of the United States.

Petitioners direct our attention primarily to the following WHTC opinions: Frank v. International Canadian Corp., 308 F.2d 520 (9th Cir. 1962); Babson Brothers Export Co. v. Commissioner, T.C. Memo. 1963-144. Respondent contends that "Cases arising under * * * [the WHTC provisions] are not applicable to a section 936 issue" (a contention we reject), and urges us to focus on "the contrary holding in another section 921 case, United States Gypsum Company v. United States", 304 F. Supp. 627 (N.D. Ill. 1969), affd. in part and revd. in part 452 F.2d 445 (7th Cir. 1971).

Frank v. International Canadian Corp., supra, involved the following situation. A, a U.S. corporation, owned B, also a U.S. corporation. B produced liquid chlorine and liquid caustic soda, which it sold to C, a Canadian corporation. For what the District Court found and what the Court of Appeals accepted were "good business reasons" (id. at 526), B created D to handle sales to C. Thereafter, B sold its products to D, which then sold them to C. The Commissioner determined that D did not qualify as a WHTC. After losing across-the-board in a refund suit in the District Court, the Commissioner contended on appeal that D did not qualify as a WHTC because it did not derive the requisite gross income "'from the active conduct of a trade or business' within the meaning of section 109(b) of the Internal Revenue Code

of 1939". Id. at 524. The Court of Appeals summarized the relevant facts as follows, id. at 523:

> [D] had its own invoices, letterheads, and employer social security number; it maintained separate books of account and it maintained its bank account at a bank different from that used by [B]; it underwent a separate annual audit by certified public accountants and it filed separate corporate income tax returns. And it had officers and directors differing from those of [B]; its officers and directors did, however, hold official positions with either [B] or [A].
>
> [D] paid one employee, Mr. Nielson, directly. Mr. Nielson was responsible for [D's] administrative work. The work consisted of maintaining [D's] books and records; reviewing all paper work done by the personnel of [B] who had been assigned to assist him; preparing export declarations and customs papers; handling correspondence; and coordinating instructions received from [C] with [B's] traffic, production, and shipping departments. During its first year of operations, [D] paid [B] $100 a month for the assistance and facilities provided by [B]; after the first year was completed, a study was made and [D's] monthly payment to [B] was increased to $200.
>
> After 1952 [D] paid Dr. William Cooper a fee to study the possibility of expanding [D's] business in the Canadian market.

The Court of Appeals ruled that these facts were sufficient to constitute the active conduct of a trade or business by D, even though the employees of B, the parent corporation, performed all the work other than that performed by D's one employee. Id. at 526-527. The taxpayer qualified for WHTC treatment.

In Babson Brothers Export Co. v. Commissioner, supra, we quoted extensively from the opinion in Frank v. International Canadian Corp., supra, and relied on the latter opinion's conclusions to hold that the taxpayer in Babson Brothers Export

Co. was in the active conduct of a trade or business, and qualified for WHTC treatment.

In Kewanee Oil Co. v. Commissioner, 62 T.C. 728, 737-738 (1974), we described as follows the essential thrust of the foregoing cases and the significance of "active conduct of a trade or business":

> Although the statutory history of the Western Hemisphere trade corporation provisions is perhaps less exhaustive than might be desired, we think it nonetheless discloses a clearly articulated legislative purpose upon the basis of which Congress enacted the provisions in question. The critical policy which emerges in the Western Hemisphere provisions, and as previously expressed in the Revenue Acts of 1921 and 1940, was Congress' desire to offset through a tax preference the competitive disadvantage suffered by certain American corporations abroad on account of the less onerous taxes to which their non-American competitors were subject. This encouragement was not, however, without limitations. By means of the source rule and the active conduct requirement Congress quite apparently sought to distinguish, however bluntly, between those corporations which themselves engaged in business activity outside the United States in direct competition with foreign corporations and those which merely invested in others' businesses abroad or otherwise did not engage in directly competitive activity. Our understanding in this respect is not different from that expressed by the few courts which have had occasion to address themselves to the language of this portion of the statute. Cf. Frank v. International Canadian Corporation, 308 F.2d 520, 525 (C.A. 9);[13] Towne Securities Corporation v. Rea Forhan Pedrick, 44 A.F.T.R. 1258, 1259 (S.D. N.Y.); Babson Bros. Export Co., 22 T.C.M. 677, 683-684. It follows that when the "active conduct" requirement is read in the context from which it arose, namely the threat of foreign competition, one might well conclude that in passing the Western Hemisphere provisions Congress intended to grant relief to United States business activity in the Americas only to the extent that the beneficiary corporation conducted active business operations abroad vulnerable to the competitive threat posed by the tax-advantaged corporation of the other countries.[14]

---

[13] It is quite true that the court in the International
Canadian case stated (p. 525) that the active conduct
requirement "is to disqualify corporations which are
'inactive' in the sense that they receive investment income
rather than business income."  But that statement was made
in the context of a situation where the taxpayer was engaged
regularly and actively in the business of making sales in
Canada, and the income in question was derived from such
sales.  The court obviously did not give any consideration
to the applicability of the statute to an isolated
transaction of the type before us, and we do not give that
language the possible expansive reading that would include
such a transaction within the "active conduct" clause.

[14] This understanding of the statutes' purpose conforms well
to the Commissioner's position that interest income, which
would otherwise constitute "passive" income outside the
purview of sec. 921(2), meets the "active conduct"
requirement when received from the taxpayer's customers on
account of their credit obligations arising from the regular
and recurring conduct of the taxpayer's business.  Rev. Rul.
65-290, 1965-2 C.B. 241.

In Kewanee Oil Co. v. Commissioner, 62 T.C. at 738, we held

that the taxpayer's income from the sale of "substantially all of

its oil- and gas-producing property and associated equipment, the

source of virtually its entire revenues until that time" was

> derived from the termination of the major portion of its
> business and not from the active conduct thereof;
> accordingly, * * * [the taxpayer] did not meet the "active
> conduct" requirement set forth in section 921 and was
> therefore not entitled to the deduction provided in section
> 922.  [Id. at 739.]

In United States Gypsum Co. v. United States, 304 F. Supp.

at 642-643, the opinion upon which respondent relies, the

District Court discussed approvingly the opinion of the Court of

Appeals for the Ninth Circuit in Frank v. International Canadian

Corp., supra.  The District Court then contrasted the factual

setting of <u>Frank v. International Canadian Corp.</u>, <u>supra</u>, with its own findings and conclusions based on the record before it, as follows (304 F. Supp. at 643):

> Clear from a reading of the <u>Frank</u> rationale and holding is that the subsidiary there took over <u>business</u> previously performed by the parent. The parent transferred <u>its selling operations to the subsidiary</u>. The court further found there that the subsidiary was not "inactive":
>
> > "The facts also show clearly that International earned its income by performing services. International resolved shipping problems with Alaska Pine; it handled all the export declarations and customs papers; it incurred and paid $124,814.72 in freight charges; it was studying the possibility of expanding its business in Canada. In the words of the district court:
> >
> > > "* * * in entire good faith International was organized as a corporation and at all times operated as a bona fide separate entity engaged in substantial and legitimate business activities from which its gross income was derived." (308 F.2d at 527)
>
> In its dealings with the affiliate mining companies Export performed no services; resolved no problems; incurred no freight charges; and engaged in no genuine business activities.
>
> I therefore find and conclude that the portion of its income derived from the purchase of crude gypsum from its sister companies and the resale to its parent was not income derived from the active conduct of a trade or business within the meaning of section 921 (26 U.S.C. §921). I further find and conclude that for this reason Export did not qualify as a Western Hemisphere Trade Corporation and was not entitled to claim the benefits of the special deductions under the Act.
>
> Thus, the opinion in <u>United States Gypsum Co. v. United States</u>, <u>supra</u>, was not thought by the District Court as being "contrary" to the rationale of <u>Frank v. International Canadian</u>

Corp., supra.  Rather, the difference in relevant facts in those two cases led to the difference in result.

In the instant cases, EAPR (1) bought, from unrelated sellers, and owned all the equipment used in Puerto Rico to manufacture the video games; (2) bought, from unrelated suppliers, and owned all the raw materials and components used in Puerto Rico to manufacture the video games; and (3) was lessee of the facilities in Puerto Rico in which the equipment and the raw materials and components were used in Puerto Rico in manufacturing the video games.  EAPR's manager lived in Puerto Rico and worked in the leased space; he supervised PPI employees in charge of managing materials and inventory control and saw to it that assembly line mistakes were corrected.  The role that EAPR played regarding video game manufacturing in Puerto Rico was much more like what the taxpayer did in Frank v. International Canadian Corp., supra, than what the taxpayer did in United States Gypsum Co. v. United States, supra.

In MedChem (P.R.), Inc. v. Commissioner, 116 T.C. at 337-343, we discussed the factual elements that, in the aggregate, led us to conclude that the taxpayer-subsidiary therein was not in the active conduct of a trade or business in Puerto Rico during the statutorily relevant 3-year time period.[10]  Although

_____

[10]See MedChem (P.R.), Inc. v. Commissioner, 116 T.C. 308, 340 (2001), where we noted that "Some of the activities listed by [the taxpayers] preceded the 3-year period, and very few of the
(continued...)

the general fact pattern of the instant cases has some similarities to that in MedChem, the aggregate of the differences between the facts of MedChem and the facts of the instant cases convinces us that the instant cases fall on the other side of the line; i.e., that EAPR actively conducted a trade or business in Puerto Rico during the relevant time period. With the caution that our conclusion is based on the aggregate of the differences between the instant cases and MedChem; i.e., that no one difference is critical by itself, we proceed to describe the significant differences.

In MedChem, the taxpayers had acquired from an unrelated entity the assets of a Puerto Rican business that manufactured and sold a specific pharmaceutical (hereinafter sometimes referred to as the drug). MedChem (P.R.), Inc. v. Commissioner, 116 T.C. at 314. The assets were divided between taxpayer-parent and taxpayer-subsidiary; the subsidiary is the corporation that was claimed to qualify for the possession tax credit under section 936(a). Id. at 314, 327. The taxpayer-parent got receivables, several noncompetition agreements, goodwill, contract rights, records, patents and related know-how, trademarks, and Food and Drug Administration approvals. Id. at

[10](...continued)
other listed activities occurred continually throughout that period." In the instant cases, it appears that all of the activities that we discuss occurred during the relevant test period.

314-315.  The taxpayer-subsidiary got receivables, inventory, and machinery and equipment located in the unrelated entity's manufacturing facility.  Idem.

As part of the sale, the unrelated entity agreed to continue manufacturing the drug for the taxpayer-subsidiary using the unrelated entity's facility and labor, and using the raw materials and equipment furnished by the taxpayer-subsidiary.  Id. at 316.  We found that the employees of the unrelated entity "performed every task required in the manufacturing process, including the supervision thereof, * * * without the right or ability of * * * [the taxpayers] to manage, direct, or control any part of the manufacturing process."  Id. at 339.  Indeed, except for the MedChem cases themselves, the taxpayers had consistently reported in all instances that the unrelated entity was the drug's manufacturer.  Id. at 340.  As a reflection of this, the labels which the taxpayer-subsidiary used during one of the years at issue in MedChem designated the unrelated entity as the manufacturer of the drug.  Id. at 315-316.  We concluded that all of the business activities related to the manufacture of the drug were directed and controlled by the unrelated entity out of its Puerto Rico-based operation, and by the taxpayer-parent, out of its U.S.-based facility.  Id. at 338.

The taxpayer-parent distributed, marketed, and sold the drug in the United States.  Id. at 339.  We found that the taxpayer-subsidiary "was expressly prohibited by the processing agreement

from taking a managerial role in the manufacturing process." Id. at 342. We concluded that the substance of the work as to the manufacturing of the drug, which required specialized skill and expertise, was performed by the unrelated entity. Id. at 343.

The facts of the instant cases are distinguishable from those in MedChem in several material respects.

In MedChem, before the acquisition described supra, the unrelated entity manufactured the drug in Puerto Rico, and the taxpayer-parent did not have anything to do with the drug. Id. at 310-311, 314. After this acquisition, the unrelated entity continued to manufacture the drug at its own facility with its own labor and was solely responsible for any problem that arose up to the time the finished product was delivered to a carrier for shipment to the taxpayer-parent. Id. at 317. Thus, although the acquisition affected ownership, it did not affect what happened "on the ground" in Puerto Rico. In contrast, in the instant cases, EA was in the entertainment software business and relied on unrelated manufacturers in Taiwan and Japan. After EAPR was created, the entertainment software was manufactured in Puerto Rico, using facilities and labor that PPI leased to EAPR, and using equipment that EAPR bought from unrelated sellers. Thus, the arrangements following the creation of EAPR created an entirely new business in Puerto Rico, using facilities, labor, and equipment that had not previously been used in this business. In contrast to MedChem, what happened "on the ground" in Puerto

Rico in the instant cases was substantially different from the
past.

    In MedChem, we concluded that the taxpayer-subsidiary's

    "business presence" in Puerto Rico was insignificant in
    that it did not contribute significantly to Puerto
    Rico's economy either by creating new jobs or by
    providing capital to others to build new plants.  * * *
    All of * * * [the taxpayer-subsidiary's] business
    activities after June 30, 1990, were based in Woburn,
    * * * [Massachusetts,] and * * * [the taxpayers']
    primary connection to Puerto Rico during that time was
    to further its efforts to move the manufacturing of
    * * * [the drug] to Woburn * * *.  Id. at 338-339.

In contrast, in the instant cases, the effect of EAPR's
operations was to transfer to Puerto Rico the manufacturing
operations that had hitherto been performed almost halfway around
the world.

    In MedChem, we found that the taxpayer-subsidiary "was
expressly prohibited by the processing agreement from taking a
managerial role in the manufacturing process." Id. at 342.  In
contrast, in the instant cases, PPI and EAPR agreed that (1) all
the lease employees "shall be under the general supervision of
EAPR", and (2) "EAPR shall also supervise and control all
technical and product-related training required by" the lease
employees.  The parties' stipulations make it clear that the EAPR
manager position was filled "at all times during the years at
issue" by "a manager who * * * worked in the leased space covered
by the Lease" and who was compensated by EAPR.  See supra table
2.  Also, it is evident that Alvarado directly supervised PPI

employees as to certain parts of the manufacturing process. He was not a foreman for PPI's assembly line employees, nor did he hire and fire them. However: (1) He made sure that mistakes were corrected; (2) he "[watched] out for EA's interests" as to the assembly work; and (3) "If things were going wrong [as to the assembly line], then PPI would call me in for assistance."

In MedChem (P.R.), Inc. v. Commissioner, 116 T.C. at 338 n.14, we stated as follows:

> [14] We distinguish Frank v. International Canadian Corp., 308 F.2d 520 (9th Cir. 1962), a case cited by petitioners to support their assertion that MedChem P.R. actively conducted a trade or business by virtue of its sales activity. The relevant holding in Frank concerned whether the taxpayer actively conducted a trade or business and did not concern where that trade or business was located.

In the instant cases, EAPR's activities in Puerto Rico with respect to the video games are critically different from the taxpayer's activities in MedChem (P.R.), Inc. v. Commissioner, supra (where the taxpayer's only activities in Puerto Rico were the taking of steps to move the business from Puerto Rico to Massachusetts), and Kewanee Oil Co. v. Commissioner, supra (where substantially all the taxpayer's relevant income was derived from the sale of substantially all the taxpayer's relevant business).

Our findings (supra I.F.) lead us to conclude that EAPR, through its manager, participated regularly, continually, extensively, and actively in the management and operation of the manufacturing of video games in Puerto Rico.

In view of the foregoing, we conclude that EAPR actively conducted a trade or business in a U.S. possession within the meaning of section 936(a)(2)(B).

4. Respondent's Other Contentions

    a. Genuine Issues of Material Fact

i. Place of Manufacture

Respondent contends as follows on opening brief:

2. There is a factual dispute as to where the video games were manufactured. * * * Whether video games were manufactured in the Dominican Republic or Puerto Rico is a crucial factor in ascertaining whether EAPR was engaged in the active conduct of a trade or business in Puerto Rico.

On answering brief, respondent objects to petitioners' proposed finding of fact that "The video games at issue that EA purchased from EAPR were manufactured in Puerto Rico. [Stip. ¶ 27]", as follows:

22. Objection. The evidence establishes that the video games that EA purchased from EAPR were manufactured by PPI employees in PPI's Dominican Republic facilities as well as in PPI's Puerto Rico facilities. See RRPSOF ¶ 17.

However, the parties stipulated as follows: "27. The video games at issue that EA purchased were manufactured in Puerto Rico." Note that respondent does not contend that EA bought the video games from PPI; respondent accepts petitioners' contention that EA bought the video games from EAPR. Respondent's only objection is as to the geographic location of the manufacturing-- the very point that the parties resolved by their stipulation.

Rule 91(e) provides, in pertinent part, as follows:

> (e) Binding Effect: A stipulation shall be treated, to the extent of its terms, as a conclusive admission by the parties to the stipulation, unless otherwise permitted by the Court or agreed upon by those parties. The Court will not permit a party to a stipulation to qualify, change, or contradict a stipulation in whole or in part, except that it may do so where justice requires. * * *

Respondent has not asked to be relieved from this stipulation, and nothing that has been brought to the Court's attention leads us to conclude that justice requires us, sua sponte, to relieve respondent from this stipulation. Compare the instant cases with, e.g., BankAmerica Corp. v. Commissioner, 109 T.C. 1, 12 (1997) (where we concluded that, in the interest of justice, the taxpayer should be relieved from the effects of a stipulation, but only for a specified "narrow purpose"); Stamos v. Commissioner, 87 T.C. 1451, 1454-1456 (1986) (where we "concluded that the language in question from the stipulation filed herein is so ambiguous and indefinite that it does not constitute a stipulation at all", and thereupon denied a motion for partial summary judgment).

Respondent explains the stipulation as follows:

The stipulations listed by Petitioners do not preclude evidence that part of the games were manufactured elsewhere, e.g., the Dominican Republic, since they refer only to what has taken place in Puerto Rico and do not address activities outside Puerto Rico.

The effect of this explanation is to treat Stipulation 27 as though it read as follows:

27. The video games at issue that EA purchased were manufactured in Puerto Rico, except to the extent they were manufactured in the Dominican Republic.

We refuse to allow respondent to unilaterally reform the filed stipulation in this matter. We do not accept respondent's unilateral explanation that the stipulation means so much less than it appears to mean.

We conclude that there is no genuine issue as to the material fact of Puerto Rican manufacture of the relevant video games.

### ii. Control Over Manufacturing Process

Respondent contends as follows:

3. There is a factual dispute as to whether EAPR had any control over the manufacturing process. According to Alvarado, there were significant conflicts between EA and PPI because EA did not want the video games to be manufactured at PPI's plant in the Dominican Republic. Alvarado Decl. ¶¶ 34-35. The manufacturing was done by PPI workers in the Dominican Republic because it was cheaper. Alvarado Decl. ¶ 22. Obviously, if EA (or EAPR) had been in control of the manufacturing process, the video games would not have been manufactured in the Dominican Republic by PPI against EA's wishes. Whether EAPR had any control over the manufacturing process is directly related to the issue of whether EAPR controlled and supervised the PPI employees. [Fn. ref. omitted.]

This asserted genuine issue of material fact is bottomed on the contention of Dominican Republic manufacture. As we have pointed out supra, i. Place of Manufacture, the parties' stipulation has foreclosed this contention. Thus, this

contention as to EAPR's control over the manufacturing process is not a genuine issue as to a material fact.

### iii.  Supervision Over Lease Employees

Respondent contends as follows:

1.    There is a factual dispute as to whether the one EAPR employee (i.e., Willie Zamora, Jose Cruz, or Miguel Orlando Alvarado) supervised or controlled the PPI employees who manufactured the video games or the EA employees who performed all of EAPR's daily operations.

Respondent relies primarily on Alvarado's declaration, which respondent offered in support of respondent's opposition to petitioners' motion.  Alvarado's declaration indicates that he was EAPR's manager for most of the period before the Court.  Alvarado's declaration states that

(1) he oversaw the transferring of raw materials, work in process, and finished goods, and in this capacity he "had two or three PPI employees under me in the materials management function"; and

(2) he--

also oversaw the PPI employees who worked on inventory control, which meant that I had to make sure that they were doing the cycle counts and that they entering [sic] the correct data onto paper inventory reports.  I was responsible for entering the data into the computer.  I oversaw that the correct data was entered into the computer for [MRP System] on the Puerto Rican end.  * * *

In general I did not deal directly with assembly line operation, since this was handled by PPI.  However, if I saw a mistake being made, then I would see that it got corrected.  My basic function in regard to the assembly work was to watch out for EA's interests.  However, PPI handled the daily production requirements and PPI scheduled the

employees, assigned positions to them, handled things on the assembly floor, took care of sick leave and other personnel problems. If things were going wrong, then PPI would call me in for assistance. Otherwise, PPI handled everything.

Respondent also relies on Cruz' declaration, which is as follows, in entirety:

1. I reside at Calle Leonor AV 21, 4th Extension, Levittown Lakes, Puerto Rico 00949.

2. I was employed by Electronic Arts Puerto Rico for a period of 3 ½ weeks in the summer of 1993.

3. I was hired about two weeks before the death of Mr. Zamora as his assistant.

4. I never held the position of General Manager nor did I ever carry out the duties of General Manager.

5. The focus of my work as assistant to Mr. Zamora was with inventory control, particularly counting inventory, communicating with Electronic Art [sic] in California in regard to inventory needs, and I also had some responsibilities with regard to shipping.

6. My employment was terminated 1 ½ weeks after Zamora died.

Respondent further contends that "Absent first hand evidence of the business practices prior to Cruz and Alvarado, Respondent is entitled to the inference that the same business practices were in effect while Zamora was employed at EARP [sic]."

As we have noted supra (in note 6, and in the description in II. A. In General, of the affidavits and declarations that the parties submitted), for purposes of the instant partial summary judgment motion, we have treated the statements as to matters of fact in the Alvarado declaration as though (1) they accurately

describe the events they deal with, and (2) the events that occurred before Alvarado was hired were consistent with these statements--except, of course, to the extent that the statements are contrary to the parties' stipulations. We give little weight to the Cruz declaration's account of the 2 weeks when he was Zamora's assistant and the 1-1/2 weeks after Zamora's death.

We conclude from the foregoing that, for the period before the Court, EAPR's employees provided substantial supervision to the PPI employees (the lease employees) who did the video game manufacturing for EAPR in Puerto Rico. Although there is room for further factual development, the material offered by respondent leads us to the conclusion that, if any such development were to show us that respondent's proffered materials fully and accurately described the facts, then we would conclude that the supervision requirement of MedChem has been satisfied.

In other words, on this issue, petitioners win on the facts as described in respondent's materials. Thus, although there may be a genuine issue as to the extent of EAPR's supervision of the manufacturing process, there is not a genuine issue as to a material fact with regard to EAPR's qualification for possession tax credits for the years in issue.

### b.  EAPR Ineligible As a Matter of Law

### i. WHTC Cases

Respondent contends that "Cases arising under section 921 and 922 [the Western Hemisphere Trade Corporation provisions] are not applicable to a section 936 issue.  See Norfolk Southern Corp. [v. Commissioner,] 104 T.C. [13] at 41 [(1995)]."

Firstly, the cited opinion, Norfolk S. Corp. v. Commissioner, 104 T.C. 13, modified 104 T.C. 417 (1995), affd. 140 F.3d 240 (4th Cir. 1998), neither states nor stands for the proposition for which respondent cites it.  The cited opinion does not even involve or cite sections 921, 922, or 936 or their predecessors.[11]

---

[11]Norfolk S. Corp. v. Commissioner, 104 T.C. 13, modified 104 T.C. 417 (1995), affd. 140 F.3d 240 (4th Cir. 1998), was an investment credit case; it did not involve the WHTC provisions or the possession tax credit provisions.  Respondent directs our attention to Norfolk S. Corp. v. Commissioner, 104 T.C. at 41. That page is part of our analysis of the taxpayer's contention that "used" in the phrase "used in the transportation of property" in sec. 48(a)(2)(B)(v), must be given the same meaning as in the phrase "used in the trade or business" in sec. 167(a)(1).  We concluded that, in the context of sec. 48(a)(2)(B)(v), it made sense to give "used" a different meaning from "used" in the context of sec. 167(a)(1).  We buttressed our conclusion as follows, Norfolk S. Corp. v. Commissioner, 104 T.C. at 40 n.30:

[30] We note in further support of our rejection of petitioners' interpretation of the container exception that in sec. 48(a)(2)(B)(v) Congress employed the phrase "used in the transportation of property", not "used in the trade or business of transporting property".  "The use of different phrases may reasonably be viewed as an indication of two different meanings."  Pavelic & LeFlore v. Marvel

(continued...)

Secondly, respondent's brief does not present to us, or direct our attention to, an analysis to support the proposition that WHTC opinions "are not applicable to a section 936 issue."

Thirdly, as opinions of this and other courts have shown, the histories of WHTC legislation and possessions corporation legislation have been intertwined for the entire history of the WHTC provisions.  See, e.g., Kewanee Oil Co. v. Commissioner, 62 T.C. 728, 735-738 (1974), and opinions cited therein, affd. without published opinion 517 F.2d 1398 (3d Cir. 1975) (a WHTC "active conduct of a trade or business" case in which the 1921 Act predecessor of section 936 is described as having "laid the conceptual groundwork," for, among other provisions, the WHTC provisions); Burke Concrete Accessories, Inc. v. Commissioner, 56 T.C. 588, 596-599 (1971), and opinions cited therein (a consolidated return case in which a section 1504(b)(4) reference to section 931 is construed by taking into account the agreement of the parties that the corporation there involved was both a WHTC and a possessions corporation).  This intertwining of

---

[11](...continued)
Entertainment Group, 493 U.S. 120, 128 (1989) (Marshall, J.,
dissenting); see also LaCroix v. Commissioner, 61 T.C. 471
(phrase "tangible personal property" interpreted for
purposes of sec. 179).

The same point, that differences in statutory terminology
ordinarily lead to the conclusion of differences in meaning, is
also made in Berry Petroleum Co. & Subs. v. Commissioner, 104
T.C. 584, 646 n.41 (1995), affd. without published opinion 142
F.3d 442 (9th Cir. 1998).  See supra note 9.

historical development increases the likelihood that the Congress was actually aware that "active conduct of a trade or business" figured in both the WHTC provisions and in section 936.

In light of the foregoing, we reject respondent's contention that WHTC cases "are not applicable to a section 936 issue", and we conclude that respondent's citation of Norfolk S. Corp. v. Commissioner, supra, does not provide any support for respondent's contention.  On the contrary, we regard WHTC opinions as authority with respect to the meaning of identical language in section 936.

### ii. Expressio Unius * * *

Respondent contends as follows:

> "There is a venerable rule of statutory construction which states: expressio unius est exclusio alterius (the expression of one thing implies the exclusion of another thing)."  Section 936(a)(2)(B) does not refer to attribution of activities, such as contract manufacturing; however, section 936(h)(5)(B)(iii)(II) does refer to "contract manufacturing."  "Where Congress includes particular language in one section of a statute but omits it in another section of the same [statute], it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."

> In choosing the words "such domestic corporation" as the statutory standard in section 936(a)(2)(B), without reference to attribution of another's activities, such as the activities of a contract manufacturer, Congress limited consideration exclusively to the domestic corporation's conduct in the possession.  In other words, the activities of others cannot be attributed to the domestic corporation for purposes of section 936(a)(2)(B).  [Citations omitted.]

In effect, the "expressio unius" rule to which respondent draws our attention is merely the obverse of what we have

discussed <u>supra</u> note 9 and accompanying text.  Ordinarily, in statutes and other legal documents, it is presumed that if the drafter uses the same terminology in several places then the drafter intends the same meaning in each such place.  By the same token it is presumed that if the drafter varies the terminology then the drafter intends that the meaning also varies.  Or, as Dickerson put it in the Interpretation and Application of Statutes 224 (1975), it is presumed that the drafter "has committed neither 'elegant variation' nor 'utraquistic subterfuge'."

A problem with the "<u>expressio unius</u>" rule is that, although the rule tells us that a different meaning is probably intended, it often is difficult to determine what that different meaning is.  See, e.g., Black's Law Dictionary 602 (7th ed. 1999).  The instant cases illustrate how the party that invokes this rule can find that the rule favors the other side.  See, e.g., Ginsburg, "Making Tax Law Through the Judicial Process," 70 A.B.A.J. 74, 76 (1984).

In general, section 936(h) deals with the treatment of intangible property income.  It provides that the domestic shareholders of a qualified domestic corporation which elects the possession tax credit are required to include in their gross income as of the close of the electing corporation's tax year their pro rata share of the possessions corporation's intangible

property income as United States source income unless an election out is made by the possessions corporation.  Sec. 936(h)(1)(A). However, the general rule of possessions corporations is inapplicable if an eligible possessions corporation elects out of its provisions by electing to use either the cost sharing method or the profit split method for computing its taxable income. This election may be made under section 936(h)(5).  For purposes of subparagraph (B) of section 936(h)(5), costs incurred by the electing corporation or a member of its affiliated group in connection with contract manufacturing by a person other than a member of the affiliated group are not treated as production costs of the electing corporation in the possession or as direct material costs or as compensation for services performed in the possession.  Sec. 936(h)(5)(B)(iii)(II).  Rather, they are treated as the direct labor costs of the affiliated group.  Id.

The effect of the term "contract manufacturing" in section 936(h)(5)(B)(iii)(II) is to make it more difficult to establish a substantial business presence in a possession--within the meaning of section 936(h)(5)(B)(i)--when the possessions corporation uses contract manufacturing for its manufacturing activities.  The term appears in a rule which is statutorily directed to apply "For purposes of this subparagraph," that is, subparagraph (B) of section 936(h)(5).  Thus, when examined in context, the "expressio unius" canon of construction suggests that contract

manufacturing is to be given a special unfavorable (for the taxpayer) effect only for purposes of section 936(h)(5)(B), and that for all other section 936 purposes contract manufacturing is not to be given an effect unfavorable to the taxpayer.  It follows that the canon of construction that respondent urges upon us does not lead to the result for which respondent contends, but rather (when the context is considered) it supports the result for which petitioners contend.

### iii. Plain Meaning; Legislative History

Respondent contends that the plain meaning of "such domestic corporation" in the statute, and the plain meaning of "it" and "its gross income" in the report of the Senate Finance Committee, lead to the conclusion that "only the possessions corporation's conduct can be considered for purposes of satisfying the active business requirement."

The same statutory language has been in the predecessors of section 936 since the initial enactment--section 262 of the Revenue Act of 1921, Pub. L. 67-98, 42 Stat. 227, 271.  The same statutory language was in the WHTC provisions--sec. 109, I.R.C. 1939.  Essentially the same argument was presented to, and rejected by, the Court of Appeals for the Ninth Circuit in Frank v. International Canadian Corp., 308 F.2d at 526-527.  In our recent opinion in MedChem (P.R.), Inc. v. Commissioner, 116 T.C.

at 337, we interpreted the statute to allow attribution of the services of nonemployees if certain conditions are satisfied.

Thus, the courts have interpreted this language to not preclude attribution as a matter of law, but rather as permitting attribution or not depending on the factual setting.  A careful examination of respondent's contention that the plain meaning of the statute and its legislative history precludes attribution leads us to conclude that such a plain meaning cannot be drawn from the statute and its legislative history.

5. Holding

We conclude that EAPR's manufacturing arrangement in Puerto Rico met the requirements of the section 936 active-conduct-of-a-trade-or-business test as we interpreted it in MedChem.  This is a highly factual determination.  Frank is also persuasive in this context.

Further, we conclude that petitioners have met their burden of showing that there is not any genuine issue as to any material fact with respect to whether EAPR actively conducted a trade or business in Puerto Rico within the meaning of section 936(a)(2)(B).

Accordingly, we hold that petitioners are entitled to summary judgment on this issue.

## C.  Significant Business Presence

### 1.  The Statutory Setting of the Dispute

If a possessions corporation has "intangible property income", then that income is generally treated as income of the possessions corporation's shareholders, in accordance with rules set forth in section 936(h).  However, a possessions corporation may "elect out" under section 936(h)(5)[12] and choose to compute

_____

[12]Par. (5) of sec. 936(h) provides, in pertinent part, as follows:

> (5) Election Out.--
>
> (A) In general.--The rules contained in paragraphs (1) through (4) do not apply for any taxable year if an election pursuant to subparagraph (F) is in effect to use one of the methods specified in subparagraph (C).
>
> (B) Eligibility.--
>
> (i) Requirement of significant business presence.--An election may be made to use one of the methods specified in subparagraph (C) with respect to a product or type of service only if an electing corporation has a significant business presence in a possession with respect to such product or type of service. An election may remain in effect with respect to such product or type of service for any subsequent taxable year only if such electing corporation maintains a significant business presence in a possession with respect to such product or type of service in such subsequent taxable year. If an election is not in effect for a taxable year because of the preceding sentence, the electing corporation shall be deemed to have revoked the election on the first day of such taxable year.
>
> (continued...)

(ii) Definition.--For purposes of this subparagraph, an electing corporation has a "significant business presence" in a possession for a taxable year with respect to a product or type of service if:

(I) the total production costs (other than direct material costs and other than interest excluded by regulations prescribed by the Secretary) incurred by the electing corporation in the possession in producing units of that product sold or otherwise disposed of during the taxable year by the affiliated group to persons who are not members of the affiliated group are not less than 25 percent of the difference between (a) the gross receipts from sales or other dispositions during the taxable year by the affiliated group to persons who are not members of the affiliated group of such units of the product produced, in whole or in part, by the electing corporation in the possession, and (b) the direct material costs of the purchase of materials for such units of that product by all members of the affiliated group from persons who are not members of the affiliated group; or

(II) no less than 65 percent of the direct labor costs of the affiliated group for units of the product produced during the taxable year in whole or in part by the electing corporation or for the type of service rendered by the electing corporation during the taxable year, is incurred by the electing corporation and is compensation for services performed in the possession; or

(III) with respect to purchases and sales by an electing corporation of all

(continued...)

its relevant taxable income under one of the methods described in section 936(h)(5)(C)--the cost sharing method or the profit split method--but only if the possessions corporation "has a significant business presence" in a possession.  Sec. 936(h)(5)(B)(i).  Section 936(h)(5)(B)(ii) provides that a possessions corporation "has a 'significant business presence'" in a possession if the corporation satisfies any one of three statutory tests.  These three tests are (1) the 25-percent-value-added test, (2) the direct-labor-production test, and (3) the

---

[12](...continued)

goods not produced in whole or in part by any member of the affiliated group and sold by the electing corporation to persons other than members of the affiliated group, no less than 65 percent of the total direct labor costs of the affiliated group in connection with all purchases and sales of such goods sold during the taxable year by such electing corporation is incurred by such electing corporation and is compensation for services performed in the possession.

Notwithstanding satisfaction of one of the foregoing tests, an electing corporation shall not be treated as having a significant business presence in a possession with respect to a product produced in whole or in part by the electing corporation in the possession, for purposes of an election to use the method specified in subparagraph (C)(ii), [the profit split method] unless such product is manufactured or produced in the possession by the electing corporation within the meaning of subsection (d)(1)(A) of section 954.

direct-labor test for purchases and resales, set forth in subclauses (I), (II), and (III), respectively, of section 936(h)(5)(B)(ii). However, the final flush language of section 936(h)(5)(B)(ii) provides that, if the possessions corporation claims the profit split method with respect to a product that the possessions corporation produces in whole or in part in the possession, then the possessions corporation does not have a significant business presence in that possession--

> unless such product is manufactured or produced in the possession by the electing corporation within the meaning of subsection (d)(1)(A) of section 954.

Respondent refers to the alternative tests set out in the three subclauses of section 936(h)(5)(B)(ii) as "the first prong", and refers to the test set out in the final flush language of section 936(h)(5)(B)(ii) as "the second prong". That terminology appears to be helpful, and we use it in the instant opinion.

2. Parties' Contentions

Many of the parties' contentions on this issue are similar to those that they made with respect to the active-conduct-of-a-trade-or-business issue. In particular, respondent contends that petitioners' partial summary judgment motion must be denied because (1) "as a matter of law * * * Petitioners cannot attribute the activities of the PPI [employees] or EA employees to EAPR" to satisfy the significant-business-presence test under

section 936(h)(5)(B), and (2) if attribution is not per se impermissible, then "there are material facts in dispute that are relevant to the statutory" test.  As to attribution, respondent contends that (a) it is contrary to the plain meaning of the statutory text; (b) it violates the "firmly established rule of statutory construction that states: <u>expressio unius est exclusio alterius</u> (the expression of one thing implies the exclusion of another thing)"; (c) the legislative history shows that the Congress did not intend to permit attribution to satisfy the profit split method; and (d) absent attribution, EAPR's own activities do not constitute the manufacture or production of the video games.

Respondent urges that the "Congress did not intend its reference [in sec. 936(h)(5)(B)(ii) (final flush)] to section 954(d)(1) to lessen the requirement that the corporation electing the profit split method must manufacture the product", without "taking into account the activities of a contract manufacturer." Also, respondent contends, the Court should not take into account respondent's interpretation of section 954 in Rev. Rul. 75-7, 1975-1 C.B. 244.[13]  Respondent contends that, if attribution is

---

[13]Interestingly, respondent includes the following among the reasons why we should not rely on Rev. Rul. 75-7, 1975-2 C.B. 244, even though that ruling was extant when sec. 936(h) was enacted:

In <u>Ashland Oil</u>, [95 T.C. 348 (1990)], the court stated:
(continued...)

not prohibited as a matter of law, then there are the following genuine issues of material fact:  (a) Whether the video games were manufactured in Puerto Rico or in the Dominican Republic; and (b) "exactly what level of involvement in Puerto Rico EAPR had in the manufacturing process  * * * and whether that level of manufacturing activity is significant enough to permit the attribution of the activities of the PPI employees to EAPR for purposes of the significant business presence test."

Petitioners contend that EAPR satisfied the first prong of the significant business presence test by satisfying the direct labor test of section 936(h)(5)(B)(iii)(II).  Petitioners contend that EAPR satisfied the second prong of the significant business presence test, and thus is eligible to use the profit split method, because EAPR met all the manufacturing requirements of section 1.954-3(a)(4), Income Tax Regs.  Petitioners maintain that PPI was not the manufacturer within the meaning of the cited regulation.  Petitioners also rely on the inventory provisions (sections 471 and 263A, and the regulations thereunder, and Rev.

---

<sup>13</sup>(...continued)
"Revenue rulings represent only the Commissioner's position concerning specific factual situations, rather than substantive authority for deciding a case in this court."  Id. at 360.  Other courts have similarly held that revenue rulings are not binding on the Commissioner, the Secretary or the courts.  Schuster v. Commissioner, 800 F.2d 627 (7th Cir. 1986), aff'g 84 T.C. 764 (1985), citing Dickman v. Commissioner, 465 U.S. 330 (1984); Stubbs, Overbeck & Associates v. United States, 445 F.2d 1142 (5th Cir. 1971).

Rul. 81-272, 1981-2 C.B. 116) and on Rev. Rul. 75-7, 1975-2 C.B. 244, to show that EAPR was the manufacturer.  Petitioners contend that what EAPR did satisfied the congressional purpose of creating jobs in Puerto Rico.

In response to respondent's "expressio unius" contentions, petitioners maintain that the Congress's inclusion of "contract manufacturing" as a consideration in section 936(h)(5)(B)(iii)(II) that limits the ability of a corporation to qualify for significant business presence treatment, should properly lead to a conclusion that contract manufacturing does not otherwise limit the ability of a corporation to so qualify.

In response to respondent's contention that the video games, or some of them, were manufactured in the Dominican Republic, petitioners rely on the stipulation that the video games were manufactured in Puerto Rico.

On opening brief, petitioners state that EAPR satisfied the first prong "and Respondent does not contend otherwise." Respondent states that "Respondent did not contend otherwise, however, until having obtained the unsigned Declaration of Miguel Orlando Alvarado."  The only objection that respondent then states as to the first prong is that "it is highly likely that some of the direct labor costs claimed by Petitioners to have been expended in the possession were really expended in the Dominican Republic."

3.  Summary of Conclusions

As we have stated supra (B.4.a.i. Place of Manufacture), we view the parties' stipulations differently than respondent.  In the relevant stipulations--executed and filed 9 days after respondent completed the Alvarado Declaration that respondent submitted in opposition to petitioners' summary judgment motion--the parties have agreed that "the video games at issue" were manufactured in Puerto Rico.  This precludes respondent from contending that, to some extent, the video games that are relevant in the instant cases were manufactured in the Dominican Republic or any place else other than Puerto Rico.  Thus, the only predicate of respondent's only challenge to EAPR's satisfaction of the first prong drops out, and petitioners are entitled to partial summary judgment that EAPR satisfied the first prong.

This leaves the second prong as the only bone of contention on this issue, whether EAPR satisfies the requirement that the video games were "manufactured or produced" in Puerto Rico "by" EAPR "within the meaning of subsection (d)(1)(A) of section 954."

Our examination of (1) section 936(h)(5)(B)(ii) and the legislative history of that provision's enactment in 1982, and (2) section 954(d)(1)(A) and the legislative history of that provision's enactment in 1962, convinces us that there is not an absolute requirement that only the activities actually performed

by a corporation's employees or officers are to be taken into account in determining whether the corporation manufactured or produced a product in a possession, within the meaning of sections 936(h)(5)(B)(ii) (final flush) and 954(d)(1)(A).

By the same token, petitioners' focus on certain language in section 1.954-3(a)(4), Income Tax Regs., overlooks the regulation's requirement that various actions have been done "by" the corporation being evaluated. Also, because of our evaluation in Spalding v. Commissioner, 66 T.C. 1017 (1976), we conclude that the Code's inventory provisions that petitioners rely on are not good precedents for interpreting "manufactured or produced" within the meaning of section 954(d)(1)(A).

In light of our rejection of both sides' views of the law, we conclude that proper evaluation of the merits of the instant cases requires a fuller development of the facts and perhaps a fuller exposition of the law consistent with the views we have expressed in this opinion. Under these circumstances, we conclude that petitioners have failed to carry their burden of proving that they are entitled to summary judgment as to the second prong.

## 4. Analysis

The dispute as to the second prong centers on the meaning of the final flush language of section 936(h)(5)(B)(ii), requiring that the product have been--

(a)  manufactured,

(b)  in Puerto Rico,

(c)  by EAPR,

and that this have been done "within the meaning of subsection (d)(1)(A) of section 954."

Ordinarily, if we do not have a clear authoritative interpretation of this language in section 936(h)(5)(B)(ii) (final flush), then we would examine other Code provisions that use the same language and treat interpretations of any such Code provisions as authoritative, or at least highly persuasive, definitions of this language.  See, e.g., supra note 9 and accompanying text, and our analysis of the meaning of "active conduct of a trade or business".  However, we have held that the terms "manufactured" and "produced" are not to be so analyzed.

In Spalding v. Commissioner, 66 T.C. 1017 (1976), the taxpayers constructed an 8-foot chain link fence around that portion of their auto wrecking yard in which their employees dismantled autos and stored salvaged parts.  Id. at 1019.  The issue before us was whether this fence qualified for the investment credit.  Id.  In order to resolve this issue we had to decide whether the taxpayers' activity constituted "manufacturing" or "production" within the meaning of section 48(a)(1)(B)(i), I.R.C. 1954.  We opined that the taxpayers' activity apparently would not constitute manufacturing or production under section 954(d)(1)(A) but would under section

341. 66 T.C. at 1020-1021. We concluded as follows, id. at 1021:

> Therefore we conclude that "manufacturing" and "production" have no uniform generalized meaning in the Code and we must look to the purposes and legislative history of section 48 for their specific meaning here.

To the same effect, see Garnac Grain Co. v. Commissioner, 95 T.C. 7, 30-31 (1990).

As best we can tell, we are most likely to give the same term different meanings in different places (i.e., to conclude that the drafter committed a "utraquistic subterfuge", whether intentionally or by mistake) if the term is short (e.g., the one-word terms "manufacturing" and "production") and is used in common (i.e., nonlegal) speech with a variety of meanings. In any event, it is clear that, as to "manufactured" and "produced", we must focus on the sections directly before us, and we are not likely to draw much assistance from the interpretation of those words as they appear in other statutes. However, see discussion infra (a. Legislative History--Sec. 936(h)), where a portion of the 1982 Act explanation by the conference committee states as follows:

> In general, the figures to be used for these calculations [the first prong tests] will be those used by the island affiliate and its affiliates in their required inventory calculations. [H. Conf. Rept. 97-760, 506, 1982-2 C.B. 600, 619.]

On this issue, also, respondent makes the "expressio unius" contention that the reference to "contract manufacturing" in section 936(h)(5)(B)(iii)(II), and the treatment of that subject in section 1.936-5(c), Q&A-3, Income Tax Regs., mean that

contract manufacturing is not to be taken into account for any other purposes, including specifically the analysis of whether the possessions corporation is the manufacturer for purposes of our second prong analysis. Respondent takes the position that both the cited statute and the cited regulation apply only to the first prong.

On the basis of the analysis set forth supra (B.4.b.ii), relating to the "active conduct of a trade or business" issue, we conclude that respondent's contention favors petitioners to some extent. That is, the presence of a restriction on contract manufacturing when evaluating the first prong, and the absence of that term in the second prong, may mean that contract manufacturing is not restricted under the second prong.

Neither side has drawn our attention to, and we have not found, caselaw interpreting the provisions of either section 936(h)(5)(B)(ii) or section 954(d)(1)(A) as relevant to the instant cases.[14] Accordingly, we examine the origins of these

---

[14]See, e.g., Vetco, Inc. v. Commissioner, 95 T.C. 579, 594 (1990), in which we ruled that we would "not address whether * * * [the subsidiary corporation] was engaged in manufacturing", because our determination under sec. 954(d)(2) made it unnecessary to answer the manufacturing question. See also id. at 580.

In Dave Fischbein Manufacturing Co. v. Commissioner, 59 T.C. 338 (1972), we held that activities of a subsidiary of the taxpayer amounted to manufacturing within the meaning of sec. 954(d)(1)(A). In Webb Export Co. v. Commissioner, 91 T.C. 131 (1988), we concluded that activities of a taxpayer amounted to production within the meaning of sec. 954(d)(1)(A), and we held
(continued...)

provisions in order to determine whether we can conclude that petitioners are entitled to summary judgment on the matter before us.

a.  Legislative History--Sec. 936(h)

Subsection (h) was added to section 936 by section 213(a)(2) of the Tax Equity and Fiscal Responsibility  Act of 1982 (hereinafter sometimes referred to as TEFRA 82), Pub. L. 97-248, 96 Stat. 324, 452.  The bill (H.R. 4961) as passed by the House of Representatives did not have a provision corresponding to subsection (h).  H. Conf. Rept. 97-760, at 504 (1982), 1982-2

---

[14](...continued)
as a result that these activities amounted to production within the meaning of sec. 993(c)(1)(A).  In each of these cases it appears that all the relevant work was done directly by employees of the company whose qualifications were in dispute.  The question before the Court in each of those cases was whether there was manufacturing or producing.  In the instant cases, respondent states on answering brief: "Respondent does not dispute that there was manufacturing.  The issue is, rather, who did the manufacturing."  We do not believe that either Dave Fischbein Manufacturing Co. or Webb Export Co. is helpful in deciding whether EAPR manufactured or produced the video games here in dispute; neither side cites either of those opinions. Both sides cite Bausch & Lomb, Inc. v. Commissioner, T.C. Memo. 1996-57.  We conclude that that opinion is not helpful in resolving the issue presented in the instant cases for the same reason that Dave Fischbein Manufacturing Co. and Webb Export Co. are not helpful--they focus on whether there was manufacturing or production, not on whether the subject corporation could properly be considered to be responsible for the manufacturing or production.

A recent review of some of the materials in this area does not deal with the significance of (1) variations in statutory language and (2) the analysis in Spalding v. Commissioner, 66 T.C. 1017 (1976).  Levine et al., "Assessing the Manufacturing Exception to Subpart F Through Contract Manufacturing Arrangements", 1 Taxation of Global Transactions 37 (2001).

C.B. 600, 617; see also Staff of Joint Comm. on Taxation, General Explanation of the Revenue Provisions of the Tax Equity And Fiscal Responsibility Act of 1982, 79 n.* (J. Comm. Print 1982) (hereinafter sometimes referred to as JCT Staff General Explanation). The bill as reported by the Senate Finance Committee and as passed by the Senate included subsection (h), as proposed to be enacted by section 218(a)(2) of the bill, but did not have a provision corresponding to paragraph (5)--the election-out provision. See text of H.R. 4691 reported by the Senate Finance Committee, 258-266; text of the Senate-passed amendments, 263-271. The election-out provision was added in conference, and was described in pertinent part as follows in the Joint Statement of Managers portion of the conference committee report (H. Conf. Rept. 97-760, 505, 510, 1982-2 C.B. at 617-618, 620; see also JCT Staff General Explanation 85, 87, 92):

Intangible income

An election may be made to treat income attributable to certain intangible property as income of the section 936 corporation eligible for the credit (and certain domestic corporations operating in the Virgin Islands) under two options--(1) a cost sharing rule and (2) a 50/50 profit split. The two exceptions with respect to certain types of intangible property found in the Senate amendment are deleted. In addition, an exception to the Senate bill is made for intangible property which has been licensed since prior to 1948 to a U.S. corporation operating in a possession and is in use by such corporation on the date of enactment.

*     *     *     *     *     *     *

### 50/50 split of combined taxable income

#### In general

This election will provide for a split between the island affiliate and its U.S. affiliates of the combined taxable income of the island affiliate and its U.S. affiliates with respect to products produced, in whole or in part, in the possession.  50% of such profit will be allocated to the island affiliate; 50% will be allocated to its U.S. affiliates.

#### Significant business presence

For an island affiliate to be eligible to apply the profit split, it must satisfy one of the significant business presence tests required for the cost sharing election for the product or type of service covered by the election.  [The first prong.] In addition, for products produced in whole or part by the island affiliate in the possession, the profit split method is available only if the island affiliate manufactures or produces the product in the possession within the meaning of the controlled foreign corporation provisions of the Code (section 954).  [The second prong.]  If the significant business presence test (including the controlled foreign corporation manufacturing or production rule) is not satisfied for a product or type of service within the product area covered by the election, no intangibles income attributable to that product or type of service will be eligible for the credit.

Respondent's brief draws our attention to two passages in the Joint Statement of Managers portion of the conference committee report, as follows:

Congressional concerns regarding the potential adverse effects of the possessions credit on revenues is reflected in the conference report for section 936(h):

> The provision as modified is intended to lessen the abuse caused by taxpayers claiming tax-free income generated by intangibles developed outside of Puerto Rico.  The conferees also intend that the provision be administered in a fashion so as to encourage increased Puerto Rican employment and

> investment in depreciable property <u>at as low a cost to the Treasury as possible</u>. [Quoting H. Conf. Rept. 97-760, at 505 (1982), 1982-2 C.B. 600, 617.]

> \*   \*   \*   \*   \*   \*   \*

> To meet its concerns, Congress incorporated a requirement for "real" investment into subsection (h).  At this point, Congress inserted the requirement at issue that in order for a possessions corporation to be eligible to elect one of the favorable income allocation methods when intangibles were involved, the corporation had to meet the significant business presence test.  The activities necessary to meet this test were to prompt "real and significant business activity" [id. at 507, <u>supra</u>, 1982-2 C.B. at 618-619] in the possessions.

The quoted items appear in the conference committee report; the

quoted language "real and significant business activity" is part

of the following explanation by the conference committee:

<u>Significant business presence</u>

> For an island affiliate to be eligible to elect cost sharing for a product or type of service, it must have and maintain a significant business presence in the possession with respect to that product or type of service.  This test is intended to require real and significant business activity in the possessions.

> The island affiliate satisfies this requirement with respect to a product or type of service if (1) more than 25 percent of the value added by the affiliated group to the product is added by the island affiliate in a possession or (2) at least 65 percent of the direct labor costs of the affiliated group for the product or service (or in connection with the purchase and sale of goods not produced by the affiliated group) are incurred by the island affiliate and are compensation for services rendered in the possession.  In general, the figures to be used for these calculations will be those used by the island affiliate and its affiliates in their required inventory calculations. The Secretary may prescribe regulations providing

significant business presence tests for other appropriate
cases (including a value added test for services), which are
consistent with the statutory tests.

Id. at 507, supra, 1982-2 C.B. 618-619.

We are at a loss to understand how the foregoing advances
the thesis of that part of respondent's brief, that "Attribution
is contrary to the legislative history and the purpose behind the
enactment of section 936."

Respondent's focus on "cost to the Treasury" led us to
examine the revenue estimates for the "Limit on possession
credit" provisions, as they appeared in the Senate Finance
Committee report (S. Rept. 97-494 Vol. 1, 102-103 (1982)), and
the conference committee report (H. Conf. Rept. 97-760, 692-693
(1982)), which are set forth in table 4.[15]

Table 4

Estimated increase in revenue
(millions of dollars) from:

| Fiscal Year | Senate Finance Committee amendment | Conference agreement |
|---|---|---|
| 1983 | 412 | 201 |
| 1984 | 1,027 | 428 |
| 1985 | 1,251 | 473 |
| 1986 | 1,356 | 516 |
| 1987 | 1,470 | 559 |

The conference committee added paragraph (5), the election-
out provision we deal with in the instant cases, to the Senate

---

[15]For a recent example of the use of congressional numerical
estimates as an aid in interpreting legislation, see Toyota Motor
Mfg., Kentucky, Inc. v. Williams, 534 U.S. 184, ___ (2002) (slip
op. at 9).

amendment's new section 936(h), and also modified other parts of the Senate amendment.  We cannot tell from the public record how much of the substantial "cost to the Treasury" (i.e., reduction in the estimated amount of the revenue increase) is attributable to the election-out change and how much is attributable to the other changes.  Nevertheless, it is clear that the Congress was willing to forgo substantial revenue (estimated at almost a billion dollars for fiscal 1987 alone) as a result of the determination to modify the provisions of the Senate Amendment. Under these circumstances, we have no way of knowing (or even making an educated guess) as to whether the "cost to the Treasury" phrase in the Joint Statement of Managers was intended to refer to the election-out provision or any specific other provision in the revisions relating to the possessions credit.

Respondent's other legislative history focus--the statement that the significant-business-presence test "is intended to require real and significant business activity in the possessions"--is in that part of the conference committee's explanatory statement that deals with "significant business presence" for purposes of the cost sharing election--what we have referred to as the first prong.  As we have pointed out, supra, respondent has already stipulated away the only challenge that respondent makes on brief as to whether EAPR has satisfied the first prong.  Thus, to the extent that the conference committee's

explanatory statement is helpful in explaining the test of the first prong, in the instant cases EAPR has met that test.

We conclude that respondent's legislative history analysis does not add even a makeweight to respondent's view of the law.

However, the legislative history (in this instance, primarily the sequence of events) does tell us something. The Senate amendment does not refer to section 954 in its version of proposed section 936(h). The Conference Committee added paragraph (5) to section 936(h), and specifically made satisfaction of the second prong depend on "the meaning of subsection (d)(1)(A) of section 954."

As a result, in order to understand how to apply the second prong, we must examine subsection (d)(1)(A) of section 954.

b. Legislative History--Sec. 954(d)

Enacted by the Revenue Act of 1962, section 954(d) is part of subpart F of part III of subchapter N of chapter 1. Through subpart F, the Congress sought to limit the tax-deferral abilities of certain foreign corporations--those meeting the definition of a "controlled foreign corporation". Vetco, Inc. v. Commissioner, 95 T.C. 579, 585-586 (1990). Under subpart F (secs. 951 through 964), a U.S. shareholder of a "controlled foreign corporation" generally must include in gross income a pro rata share of the corporation's foreign base company income,

which includes, inter alia, foreign base company sales income.

Section 954(d)(1) provides, in pertinent part, as follows:

SEC. 954. FOREIGN BASE COMPANY INCOME.

(d) Foreign Base Company Sales Income.--

(1) In general.--For purposes of subsection (a)(2), the term "foreign base company sales income" means income (whether in the form of profits, commissions, fees, or otherwise) derived in connection with the purchase of personal property from a related person and its sale to any person, the sale of personal property to any person on behalf of a related person, the purchase of personal property from any person and its sale to a related person, or the purchase of personal property from any person on behalf of a related person where--

(A) the property which is purchased (or in the case of property sold on behalf of a related person, the property which is sold) is manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized, and

*     *     *     *     *     *     *

For purposes of this subsection, personal property does not include agricultural commodities which are not grown in the United States in commercially marketable quantities.

The language of section 954(d)(1)(A) appeared in almost identical form as proposed new Code section 952(e)(2)(A) in H.R. 10650 (bill pp. 112-113), the Revenue Act of 1962, as reported by the House Ways and Means Committee. The enacted language appeared in identical form as proposed new Code section 954(d)(1)(A) in H.R. 10650 (bill p. 190), as reported by the Senate Finance Committee. H. Conf. Rept. 87-2508 (1962), 6-7

(statutory language), 31 (description), 1962-3 C.B. 1129, 1159.

The committee reports explain as follows:

> The "foreign base company sales income" referred to here means income from the purchase and sale of property, without any appreciable value being added to the product by the selling corporation. This does not, for example, include cases where any significant amount of manufacturing, major assembling, or construction activity is carried on with respect to the product by the selling corporation. On the other hand, activity such as minor assembling, packaging, repackaging or labeling will not be sufficient to exclude the profits from this definition.

> The sales income with which your committee is primarily concerned is income of a selling subsidiary (whether acting as principal or agent) which has been separated from manufacturing activities of a related corporation merely to obtain a lower rate of tax for the sales income. This accounts for the fact that this provision is restricted to sales of property, to a related person, or to purchases of property from a related person. Moreover, the fact that a lower rate for tax for such a company is likely to be obtained only through purchases and sales outside of the country in which it is incorporated, accounts for the fact that the provision is made inapplicable to the extent the property is manufactured, produced, grown, or extracted in the country where the corporation is organized or where it is sold for use, consumption, or disposition in that country. Mere passage of title or the place of the sale are not relevant in this connection.

> \* \* \* \* \* \* \*

> (d) Foreign base company sales income.--Paragraph (1) of subsection (d) corresponds to section 952(e)(2) of the bill as passed by the House and defines foreign base company sales income as income (whether in the form of profits, commissions, fees, or otherwise) derived in connection with:

> > (1) the purchase of personal property from a related person and its sale to any person,

> > (2) the sale of personal property to any person on behalf of a related person,

(3) the purchase of personal property from any person and its sale to a related person, or

(4) the purchase of personal property from any person on behalf of a related person,

where (A) the property which is purchased (or in the case of property sold on behalf of a related person, the property which is sold) is manufactured, produced, grown, or extracted outside the country under the laws of which the controlled foreign corporation is created or organized, and (B) the property is sold for use, consumption, or disposition outside such foreign country, or, in the case of property purchased on behalf of a related person, is purchased for use, consumption, or disposition outside such foreign country.

The definition does not apply to income of a controlled foreign corporation from the sale of a product which it manufactures. In a case in which a controlled foreign corporation purchases parts or materials which it then transforms or incorporates into a final product, income from the sale of the final product would not be foreign base company sales income if the corporation substantially transforms the parts or materials, so that, in effect, the final product is not the property purchased. Manufacturing and construction activities (and production, processing, or assembling activities which are substantial in nature) would generally involve substantial transformation of purchased parts or materials. [S.Rept. 87-1881, 84, 245 (1962), 1962-3 C.B. 703, 790, 949; H. Rept. 87-1447, 62, A94-A95 (1962), 1962-3 C.B. 402, 466, 592-593.]

In general, taxpayers found it beneficial under subpart F to show that income of a controlled foreign corporation was derived from the sale of personal property which was manufactured or produced in a foreign country by the controlled foreign corporation.

c.  Harmonizing; Conclusions

In the instant cases each side contends that Treasury Regulations require a decision favoring that side.  Respondent

urges us to rely on section 1.936-5(b)(6), Q&A-1, Income Tax

Regs.[16]  Petitioners urge us to rely on section 1.954-3(a)(4),

--------

[16]Sec. 1.936-5(b)(6), Q&A-1, Income Tax Regs., provides as follows:

Sec. 1.936-5  Intangible property income when an election out is made: Product, business presence, and contract manufacturing.

*     *     *     *     *     *     *

(b) Requirement of significant business presence--

*     *     *     *     *     *     *

(6) Manufacturing within the meaning of section 954(d)(1)(A).
Q. 1:  What is the test for determining, within the meaning of section 954(d)(1)(A), whether a product is manufactured or produced by a possessions corporation in a possession?
A. 1:  A product is considered to have been manufactured or produced by a possessions corporation in a possession within the meaning of section 954(d)(1)(A) and sec. 1.954-3(a)(4) if--
(i)   The property has been substantially transformed by the possessions corporation in the possession;
(ii)  The operations conducted by the possessions corporation in the possession in connection with the property are substantial in nature and are generally considered to constitute the manufacture or production of property; or
(iii) The conversion costs sustained by the possessions corporation in the possession, including direct labor, factory burden, testing of components before incorporation into an end product and testing of the manufactured product before sales account for 20 percent or more of the total cost of goods sold of the possessions corporation.

In no event, however, will packaging, repackaging, labeling, or minor assembly operations constitute manufacture or production of property.  See particularly examples 2 and 3 of sec. 1.954-3(a)(4)(iii).

Income Tax Regs.[17]  Respondent responds that--

_____

[17]Sec. 1.954-3(a)(4), Income Tax Regs., provides as follows (examples omitted):

Sec. 1.954-3 Foreign base company sales income.

(a) <u>Income included</u>.

*    *    *    *    *    *    *

(4) Property manufactured or produced by the controlled foreign corporation--(i) In general.  Foreign base company sales income does not include income of a controlled foreign corporation derived in connection with the sale of personal property manufactured, produced, or constructed by such corporation in whole or in part from personal property which it has purchased.  A foreign corporation will be considered, for purposes of this subparagraph, to have manufactured, produced, or constructed personal property which it sells if the property sold is in effect not the property which it purchased.  In the case of the manufacture, production, or construction of personal property, the property sold will be considered, for purposes of this subparagraph, as not being the property which is purchased if the provisions of subdivision (ii) or (iii) of this subparagraph are satisfied.  For rules of apportionment in determining foreign base company sales income derived from the sale of personal property purchased and used as a component part of property which is not manufactured, produced, or constructed, see subparagraph (5) of this paragraph.
(ii) Substantial transformation of property.  If purchased personal property is substantially transformed prior to sale, the property sold will be treated as having been manufactured, produced, or constructed by the selling corporation.  The application of this subdivision may be illustrated by the following examples:

*    *    *    *    *    *    *

(iii) Manufacture of a product when purchased components constitute part of the property sold.  If purchased property is used as a component part of personal property which is sold, the sale of the property will be treated as the sale of a manufactured product, rather than the sale of component parts, if the operations conducted by
(continued...)

Petitioners' primary authority should be the regulation that explicates the section of the Internal Revenue Code that is at issue in this case [i.e., sec. 936, which provides the credit that is the subject of the dispute], particularly where this regulation addresses the issue that is in dispute.

Petitioners point out that the Congress made the choice of requiring that the section 936(h)(5)(B)(ii) second prong test be determined "within the meaning of section 954(d)(1)(A)", and "Accordingly, the determination of whether EAPR manufactured or produced the video games must be made pursuant to section 954(d)(1)(A) (and the regulations and other authority thereunder), and not pursuant to any other principles."

Section 936(h)(5)(B)(ii) and the legislative history of its enactment in TEFRA 82 make it clear that the test for satisfying the second prong is to be that which is derived from section 954(d)(1)(A).  In this, we agree with petitioners.  We reject

---

[17](...continued)
the selling corporation in connection with the property purchased and sold are substantial in nature and are generally considered to constitute the manufacture, production, or construction of property.  Without limiting this substantive test, which is dependent on the facts and circumstances of each case, the operations of the selling corporation in connection with the use of the purchased property as a component part of the personal property which is sold will be considered to constitute the manufacture of a product if in connection with such property conversion costs (direct labor and factory burden) of such corporation account for 20 percent or more of the total cost of goods sold.  In no event, however, will packaging, repackaging, labeling, or minor assembly operations constitute the manufacture, production, or construction of property for purposes of section 954(d)(1). * * *

respondent's thesis, that regulations under section 936 must control because the credit that petitioners claim is a credit under section 936. However, we are not aware of, and petitioners have not directed our attention to, any requirement that a regulation cannot effectively control a determination under section 954 unless it is a regulation under section 954. Section 7805(a), the basic regulation-prescribing authority for the Treasury Department does not impose such a restriction. Accordingly, we reject petitioners' thesis, that we follow regulations numbered 1.954 and ignore regulations numbered 1.936. Instead, we conclude that both section 1.936-5(b)(6), Q&A-1, Income Tax Regs., and section 1.954-3(a)(4), Income Tax Regs., are authoritative interpretations of the statute and guide us in the instant cases in ruling on EAPR's eligibility to use the profit split method of section 936(h)(5)(C)(ii), by determining whether or not the video games were manufactured or produced in Puerto Rico by EAPR "within the meaning of (d)(1)(A) of section 954." To the extent possible, we should harmonize the foregoing regulations. See, e.g., Bencivenga v. Western Pa. Teamsters, 763 F.2d 574, 579 (3d Cir. 1985), where the Court of Appeals "conclude[d] that in this instance the language of [Treasury] Regulation 1.411(d)-3(b) is not in fact inconsistent with Regulation 1.411(a)-7(a)(1)(ii)." We reach the same conclusion with regard to the regulations before us.

Section 1.954-3(a)(4)(i), Income Tax Regs., provides the following basic general rule:

> Foreign base company sales income does not include income of a controlled foreign corporation derived in connection with the sale of <u>personal property manufactured, produced</u>, or constructed <u>by such corporation</u> in whole or in part from personal property which it has purchased. [Emphasis added.]

The remaining language in subparagraph (4) expands on this basic general rule. Petitioners' focus on the text of these expansions ignores the context provided by the general rule, that the property must have been manufactured or produced by the corporation that is the subject of the inquiry.

Section 1.936-5(b)(6), Q&A-1, Income Tax Regs., requires in each of its alternatives, that the activity be performed "by the possessions corporation". Respondent's focus on this phrase ignores the fact that corporations pay persons (individuals or other entities) to actually do things, and that the regulation does not tell us whether we are to take into account for these purposes only those things done by employees or officers of the corporation that is the subject of the inquiry.

Neither of the foregoing regulations explicitly allows or disallows "attribution", even though both of these regulations require that the corporation being tested be the manufacturer or the producer. Thus, both regulations present the same question of interpretation in almost the same words. In this respect, the

two regulations are consistent with each other, and neither regulation clearly answers the question we face.

"Plain meaning" contentions notwithstanding, we cannot properly lay the findings of fact next to the statute or regulations and just read off the answers to the questions here presented.[18]

Given that petitioners failed to consider the "by such corporation" language of section 1.954-3(a)(4)(i), Income Tax Regs., and that respondent failed to consider the reality that a corporation engages others to do things on its behalf, we cannot conclude with the requisite degree of certainty that the factual record presented herein is sufficient.  The shortcomings of the parties' legal contentions noted above make it far from clear that all of the material facts have even been presented, let alone that there is not a genuine issue with respect thereto. Accordingly, even though we cannot agree with respondent's analysis, we conclude that petitioners have failed to carry their obligation as movants to show that there is no substantial

---

[18]See, e.g., the following description of a court's role in certain "simple" litigation:

> When an act of Congress is appropriately challenged in the courts as not conforming to the constitutional mandate the judicial branch of the Government has only one duty,--to lay the article of the Constitution which is invoked beside the statute which is challenged and to decide whether the latter squares with the former. * * * [United States v. Butler, 297 U.S. 1, 62 (1936).]

dispute about a material fact and that they are entitled to judgment as a matter of law.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) (citing Kennedy v. Silas Mason Co., 334 U.S. 249 (1948)).

5.  Holding

We hold for respondent on the second prong--that petitioners' motion for partial summary judgment will not be granted as to whether EAPR's activities with respect to the video games in the years before the Court amount to EAPR's manufacture or production of video games in Puerto Rico within the meaning of subsection (d)(1)(A) of section 954.  We hold for petitioners on the first prong--that petitioners' motion for partial summary judgment will be granted as to whether EAPR's activities with respect to the video games in the years before the Court amount to EAPR's having a substantial business presence in Puerto Rico within the meaning of clause (ii) of section 936(h)(5)(B) without taking into account the requirements of the final flush language of that clause.

An appropriate order will be issued granting in part and denying in part petitioners' motion for partial summary judgment.